# UNITED STATES *v.* NATIONAL BANK
# OF COMMERCE

No. 84–498.   Argued April 15, 1985—Decided June 26, 1985

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, REHNQUIST, and O'CONNOR, JJ., joined. POWELL, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 733.

*Albert G. Lauber, Jr.,* argued the cause for the United States. With him on the brief were *Solicitor General Lee, Assistant Attorney General Archer, William S. Estabrook,* and *John A. Dudeck, Jr.*

*Terry F. Wynne* argued the cause and filed a brief for respondent.

JUSTICE BLACKMUN delivered the opinion of the Court.

Section 6331(a) of the Internal Revenue Code of 1954, as amended, 26 U. S. C. § 6331(a), provides that the Government may collect taxes of a delinquent taxpayer "by levy

upon all property and rights to property . . . belonging to such person."[1]  Section 6332(a) of the Code, 26 U. S. C. § 6332(a), then provides that "any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights . . . to the Secretary."[2]

The controversy in this case concerns two joint accounts in a bank in Arkansas.[3]  The issue is whether the Internal Revenue Service (IRS) has a right to levy on those accounts for delinquent federal income taxes owed by only one of the persons in whose names the joint accounts stand in order that the IRS may obtain provisional control over the amount in question.

## I

### A

The relevant facts are stipulated.  On December 10, 1979, the IRS assessed against Roy J. Reeves federal income taxes, penalties, and interest for the taxable year 1977 in

---

[1] Section 6331(a) reads in pertinent part:

"If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax . . . by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person. . . ."

Section 7701(a)(11)(B) of the Code reads:

"The term 'Secretary' means the Secretary of the Treasury or his delegate."

[2] Section 6332(a) reads:

"Except as otherwise provided in subsection (b), any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made shall, upon demand of the Secretary, surrender such property or rights (or discharge such obligation) to the Secretary, except such part of the property or rights as is, at the time of such demand, subject to an attachment or execution under any judicial process."

[3] "The basic legal conception of a 'joint account' means that it be in two or more names." *Harbour* v. *Harbour*, 207 Ark. 551, 555, 181 S. W. 2d 805, 807 (1944).

the total amount of $3,607.45. As a result of payments and credits, the amount owing on the assessment was reduced to $856.61. App. 11.

On June 13, 1980, there were on deposit with respondent National Bank of Commerce, at Pine Bluff, Ark., the sum of $321.66 in a checking account and the sum of $1,241.60 in a savings account, each in the names of "Roy Reeves or Ruby Reeves or Neva R. Reeves." *Id.*, at 11–12.[4] Each of the persons named, Roy Reeves, Ruby Reeves, and Neva R. Reeves, was authorized by contract with the bank to make withdrawals from each of these joint accounts. *Id.*, at 12.

On the same date, that is, on June 13, 1980, a notice of levy was served on the respondent bank pursuant to § 6331(d) of the Code, 26 U. S. C. § 6331(d), demanding that the bank pay over to the United States all sums the bank owed to Roy J. Reeves up to a total of $1,302.56. Subsequently, there was a Partial Release of Levy for the amount in excess of $856.61. On October 10, a final demand for payment was served on the bank.

The bank, contending that it did not know how much of the money on deposit belonged to Roy as opposed to Ruby and Neva, refused to comply with the levy. *Ibid.* The United States thereupon instituted this action in the United States District Court for the Eastern District of Arkansas, pursuant to § 6332(c)(1) of the Code, 26 U. S. C. § 6332(c)(1), seeking judgment against the bank in the amount of $856.61.[5]

---

[4] No point is made as to any distinction between the "Roy J. Reeves" against whom the assessment was made, and the "Roy Reeves" whose name was on the two accounts. We assume, accordingly, that Roy J. Reeves and Roy Reeves are one and the same person.

The record does not disclose any relationship that may exist among the three codepositors. The parties have indicated that Neva is Roy's wife and that Ruby is his mother.

[5] The complaint also asserted liability, under § 6332(c)(2), for a 50% penalty. See App. 7. The Government, however, subsequently waived the penalty claim, and the complaint was amended accordingly. *Id.*, at 13–15.

By way of a supplement to the stipulation of facts, it was agreed that "[n]o further evidence as to the ownership of the monies in the subject bank accounts will be submitted." *Id.,* at 17. As a consequence, we do not know which of the three codepositors, as a matter of state law, owned the funds in the two accounts, or in what proportion. The facts thus come to us in very bare form. We are not confronted with any dispute as to who owns what share of the accounts. We deal simply with two joint accounts in the names of three persons, with each of the three entitled to draw out all the money in each of the accounts.

B

The case was submitted to the District Court on cross-motions for summary judgment and on the respondent bank's motion to dismiss the complaint. *Id.,* at 18–24. The District Court granted the motion to dismiss, holding the case procedurally "premature." 554 F. Supp. 110, 117 (1982). The court concluded that due process mandates "something more than the post-seizure lawsuit allowed" by the Code's levy procedures. *Id.,* at 114. In its view, "the minimum due process required in distraint actions against joint bank accounts," *ibid.,* compelled the IRS to identify the codepositors of the delinquent taxpayer and to provide them with notice and an opportunity to be heard. *Id.,* at 114–115. The court then outlined the procedures it believed the Constitution requires the IRS to follow when levying on a joint account. Specifically, it ruled that a bank, upon receiving a notice of levy, should freeze the assets in the account and provide the IRS with the names of the codepositors. *Id.,* at 114. The IRS then should notify the codepositors and give them a reasonable time "in which to respond both to the government and to the bank by affidavit or other appropriate means, specifically setting out any ownership interest in the joint account which they claim and the factual and legal basis for that claim." *Id.,* at 115. If the bank, on the basis of

such information, "believes that a genuine dispute exists as to the legality of any ownership claim made by" the codepositors, "it may refuse to surrender any portion of the funds so claimed." *Id.*, at 116. At that point, "the government may bring suit to enforce the levy on the contested funds," *ibid.*, but it must name the codepositors as defendants along with the bank.

The United States Court of Appeals for the Eighth Circuit affirmed. 726 F. 2d 1292 (1984). It expressed no opinion on the District Court's constitutional analysis. *Id.*, at 1293, 1300. It reached essentially the same result, however, as a matter of statutory construction. It ruled that the IRS, when levying on a joint bank account, has the burden of proving "the actual value of the delinquent taxpayer's interest in jointly owned property." *Id.*, at 1293. It observed that here "the rights of the various parties," *id.*, at 1300, had not been determined. Therefore, the Government had not shown the bank to be in possession of property or rights to property belonging to the delinquent taxpayer, Roy J. Reeves, as § 6331(a) required.

The Court of Appeals acknowledged that "Roy could have withdrawn any amount he wished from the account and used it to pay his debts, including federal income taxes. . . ." *Id.*, at 1295. It rejected, however, the Government's contention that it stood "in Roy's shoes and could do anything Roy could do, subject to whatever duties Roy owes to Ruby or Neva," *id.*, at 1295–1296, for it observed that "at least as to ordinary creditors, [that] is not the law of Arkansas." *Id.*, at 1296. Under state garnishment law, the court noted, a creditor of a codepositor is not "subrogated to that co-owner's power to withdraw the entire account." Instead, a creditor must join both co-owners as defendants and permit them to "show by parol or otherwise the extent of his or her interest in the account." *Ibid.*

The Court of Appeals then concluded that a similar precept should apply in administrative levy proceedings under the

Internal Revenue Code. It accordingly ruled that the Government could not prevail without negating or quantifying the claims that Ruby or Neva might have to the funds in question. It expressed the belief that an IRS administrative levy "is not normally intended for use as against property in which third parties have an interest" or as "against property bearing on its face the names of third parties." *Id.*, at 1300. In such a situation, the Government was free to "brin[g] suit to foreclose its lien under Section 7403," joining the codepositors as defendants. *Ibid.*

Because the opinion of the Court of Appeals appeared to us to conflict, directly or in principle, with decisions of other Courts of Appeals,[6] we granted certiorari. 469 U. S. 1105 (1985).

## II

## A

Section 6321 of the Code, 26 U. S. C. § 6321, provides: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." Under the succeeding § 6322, the lien generally arises when an assessment is made, and it continues until the taxpayer's liability "is satisfied or becomes unenforceable by reason of lapse of time."

The statutory language "all property and rights to property," appearing in § 6321 (and, as well, in §§ 6331(a) and, essentially, in 6332(a), see nn. 1 and 2, *supra*), is broad

---

[6] See, *e. g.*, *United States* v. *Sterling National Bank & Trust Co. of New York*, 494 F. 2d 919, 922 (CA2 1974); *United States* v. *Citizens & Southern National Bank*, 538 F. 2d 1101, 1105–1107 (CA5 1976), cert. denied, 430 U. S. 945 (1977); *Babb* v. *Schmidt*, 496 F. 2d 957, 958–960 (CA9 1974); *Bank of Nevada* v. *United States*, 251 F. 2d 820, 824–826 (CA9 1957), cert. denied, 356 U. S. 938 (1958). See also Rev. Rul. 79–38, 1979–1 Cum. Bull. 406, 407.

and reveals on its face that Congress meant to reach every interest in property that a taxpayer might have. See 4 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 111.5.4, p. 111–100 (1981) (Bittker). "Stronger language could hardly have been selected to reveal a purpose to assure the collection of taxes." *Glass City Bank* v. *United States*, 326 U. S. 265, 267 (1945).

A federal tax lien, however, is not self-executing. Affirmative action by the IRS is required to enforce collection of the unpaid taxes. The Internal Revenue Code provides two principal tools for that purpose. The first is the lien-foreclosure suit. Section 7403(a) authorizes the institution of a civil action in federal district court to enforce a lien "to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax." Section 7403(b) provides: "All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto." The suit is a plenary action in which the court "shall . . . adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property." § 7403(c). See generally *United States* v. *Rodgers*, 461 U. S. 677, 680–682 (1983). The second tool is the collection of the unpaid tax by administrative levy. The levy is a provisional remedy and typically "does not require any judicial intervention." *Id.*, at 682. The governing statute is § 6331(a). See n. 1, *supra*. It authorizes collection of the tax by levy which, by § 6331(b), "includes the power of distraint and seizure by any means."

In the situation where a taxpayer's property is held by another, a notice of levy upon the custodian is customarily served pursuant to § 6332(a). This notice gives the IRS the right to all property levied upon, *United States* v. *Eiland*, 223 F. 2d 118, 121 (CA4 1955), and creates a custodial relationship between the person holding the property and the IRS so that the property comes into the constructive possession of the Government. *Phelps* v. *United States*, 421 U. S.

330, 334 (1975). If the custodian honors the levy, he is "discharged from any obligation or liability to the delinquent taxpayer with respect to such property or rights to property arising from such surrender or payment." § 6332(d). If, on the other hand, the custodian refuses to honor a levy, he incurs liability to the Government for his refusal. § 6332(c)(1).

The administrative levy has been aptly described as a "provisional remedy." 4 Bittker, ¶ 111.5.5, at 111–108. In contrast to the lien-foreclosure suit, the levy does not determine whether the Government's rights to the seized property are superior to those of other claimants; it, however, does protect the Government against diversion or loss while such claims are being resolved. "The underlying principle" justifying the administrative levy is "the need of the government promptly to secure its revenues." *Phillips* v. *Commissioner*, 283 U. S. 589, 596 (1931). "Indeed, one may readily acknowledge that the existence of the levy power is an essential part of our self-assessment tax system," for it "enhances voluntary compliance in the collection of taxes." *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 350 (1977). "Among the advantages of administrative levy is that it is quick and relatively inexpensive." *United States* v. *Rodgers*, 461 U. S., at 699.

The constitutionality of the levy procedure, of course, "has long been settled." *Phillips* v. *Commissioner*, 283 U. S., at 595. See *G. M. Leasing Corp.* v. *United States*, 429 U. S., at 352, n. 18.

B

It is well established that a bank account is a species of property "subject to levy," within the meaning of §§ 6331 and 6332. A levy on a bank account has been permitted since the Revenue Act of 1924, § 1016, 43 Stat. 343, and the Treasury Regulations explicitly authorize such levies. Treas. Reg. § 301.6331–1(a)(1), 26 CFR § 301.6331–1(a)(1) (1984).

The courts uniformly have held that a bank served with an IRS notice of levy "has only two defenses for a failure to com-

ply with the demand." *United States* v. *Sterling National Bank & Trust Co. of New York*, 494 F. 2d 919, 921 (CA2 1974), and cases cited. One defense is that the bank, in the words of § 6332(a), is neither "in possession of" nor "obligated with respect to" property or rights to property belonging to the delinquent taxpayer. The other defense, again with reference to § 6332(a), is that the taxpayer's property is "subject to a prior judicial attachment or execution." 494 F. 2d, at 921. Accord, *Bank of Nevada* v. *United States*, 251 F. 2d 820, 824 (CA9 1957), cert. denied, 356 U. S. 938 (1958).

There is no suggestion here that the Reeves accounts were subject to a prior judicial attachment or execution. Nor is there any doubt that the bank was "obligated with respect to" the accounts because, as it concedes, "Roy Reeves did have a right under Arkansas law to make withdrawals from the bank accounts in question." Brief for Respondent 2. The bank's only defense, therefore, is that the joint accounts did not constitute "property or rights to property" of Roy J. Reeves. See § 6331(a).

C

" '[I]n the application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.' " *Aquilino* v. *United States*, 363 U. S. 509, 513 (1960), quoting *Morgan* v. *Commissioner*, 309 U. S. 78, 82 (1940). See also *Sterling National Bank*, 494 F. 2d, at 921. This follows from the fact that the federal statute "creates no property rights but merely attaches consequences, federally defined, to rights created under state law." *United States* v. *Bess*, 357 U. S. 51, 55 (1958). And those consequences are "a matter left to federal law." *United States* v. *Rodgers*, 461 U. S., at 683. "[O]nce it has been determined that state law creates sufficient interests in the [taxpayer] to satisfy the requirements of [the statute], state law is inoperative," and the tax consequences thenceforth are dictated by federal law. *United States* v. *Bess*, 357 U. S., at 56–57. See also *Fidelity &*

*Deposit Co. of Maryland* v. *New York City Housing Authority*, 241 F. 2d 142, 144 (CA2 1957); Note, Property Subject to the Federal Tax Lien, 77 Harv. L. Rev. 1485, 1486–1487 (1964).

In the *Bess* case, the Court held that a delinquent taxpayer, who had purchased life insurance policies, did not have "property or rights to property" in the death proceeds of the policies, but that he did have such rights in their cash surrender value. 357 U. S., at 55–56. The latter conclusion, it was said, followed from the fact that the taxpayer insured had "the right under the policy contract to compel the insurer to pay him this sum." *Id.*, at 56. Thus, the insured's interest in the cash surrender value was subject to the federal tax lien. The fact that "under State law the insured's property right represented by the cash surrender value is not subject to creditors' liens" was irrelevant. *Id.*, at 56–57. State law defined the nature of the taxpayer's interest in the property, but the state-law consequences of that definition are of no concern to the operation of the federal tax law.

As noted above, it is stipulated that Roy J. Reeves had the unqualified right to withdraw the full amounts on deposit in the joint accounts without notice to his codepositors. In any event, wholly apart from the stipulation, Roy's right of withdrawal is secured by his contract with the bank, as well as by the relevant Arkansas statutory provisions. See Ark. Stat. Ann. §§ 67–521 and 67–552 (1980).[7] On its part, the bank was obligated to honor any withdrawal requests Roy might make, even up to the full amounts of the accounts. The Court of Appeals thus correctly concluded that, under Arkansas law, "Roy could have withdrawn any amount he wished from the account and used it to pay his debts, including federal income

---

[7] Effective March 25, 1983, after the issuance of the notice of levy here, § 67–552 was amended and § 67–521 was repealed. 1983 Ark. Gen. Acts, No. 843, §§ 1 and 2. The result was recodification without substantial change.

taxes, and his co-owners would have had no lawful complaint against the bank." 726 F. 2d, at 1295.

Roy, then, had the absolute right under state law and under his contract with the bank to compel the payment of the outstanding balances in the two accounts. This, it seems to us, should have been an end to the case, for we agree with the Government that such a state-law right constituted "property [or] rights to property . . . belonging to" Roy, within the meaning of § 6331(a). The bank, in its turn, was "obligated with respect to" Roy's right to that property, § 6332(a), since state law required it to honor any withdrawal request he might make. The bank had no basis for refusing to honor the levy.[8]

The overwhelming majority of courts that have considered the issue have held that a delinquent taxpayer's unrestricted right to withdraw constitutes "property" or "rights to property" subject to provisional IRS levy, regardless of the facts

---

[8] The dissent misunderstands the import of *United States* v. *Bess*, 357 U. S. 51, 55 (1958). See *post*, at 741–748. Because state law gives the delinquent the right to withdraw, but puts certain limits on the rights of creditors, and attaches certain consequences to that right as regards the delinquent himself, the dissent asserts that the Government is limited by these same state-law constraints. Thus it urges that the Government's right here is no greater than the rights given under state law, the right to withdraw and nothing else. It therefore erroneously characterizes the Government's authority here as limited to the right to levy on the right to withdraw, and nothing else. See *post*, at 741–745, and nn. 9 and 10. But under *Bess*, state law controls only in determining the nature of the legal interest which the taxpayer has in the property. See also *Aquilino* v. *United States*, 363 U. S. 509, 513 (1960). Once it is determined that under state law the delinquent has the right to withdraw property in a joint bank account, it is a matter of *federal* law what consequences attach to this right. And we agree with the Government that as a matter of federal law, the state-law right to withdraw money from a joint bank account is a "right to property" adequate to justify the use of the provisional levy procedure of § 6331. The dissent's references to state cases concerning the state-law implications of the right to withdraw, see *post*, at 741, thus are entirely irrelevant, for such state law is "inoperative" in determining the federal tax consequences of the delinquent's right to withdraw. See *Bess*, 357 U. S., at 56–57.

that other claims to the funds may exist and that the question of ultimate ownership may be unresolved at the time. See, e. g., *United States* v. *Sterling National Bank & Trust Co. of New York*, 494 F. 2d, at 921–922; *United States* v. *Citizens & Southern National Bank*, 538 F. 2d 1101, 1105–1107 (CA5 1976), cert. denied, 430 U. S. 945 (1977); *Citizens & Peoples National Bank of Pensacola, Fla.* v. *United States*, 570 F. 2d 1279, 1282–1284 (CA5 1978); *Babb* v. *Schmidt*, 496 F. 2d 957, 958–960 (CA9 1974); *Bank of Nevada* v. *United States*, 251 F. 2d, at 824–826; *United States* v. *First National Bank of Arizona*, 348 F. Supp. 388, 389 (Ariz. 1970), aff'd, 458 F. 2d 513 (CA9 1972); *United States* v. *Equitable Trust Co.*, 49 AFTR2d ¶ 82–428 (Md. 1982); *Sebel* v. *Lytton Savings & Loan Assn.*, 65–1 USTC ¶ 9343 (SD Cal. 1965); *Tyson* v. *United States*, 63–1 USTC ¶ 9300 (Mass. 1962); *United States* v. *Third Nat. Bank & Trust Co.*, 111 F. Supp. 152, 155–156 (MD Pa. 1953). And the Eighth Circuit itself has observed that the "unqualified contractual right to receive property is itself a property right subject to seizure by levy." *St. Louis Union Trust Co.* v. *United States*, 617 F. 2d 1293, 1302 (1980).[9]

Common sense dictates that a right to withdraw qualifies as a right to property for purposes of §§ 6331 and 6332. In a levy proceeding, the IRS "'steps into the taxpayer's shoes,'" *United States* v. *Rodgers*, 461 U. S., at 691, n. 16, quoting 4 Bittker, ¶ 111.5.4, at 111–102; M. Saltzman, IRS Practice and Procedure ¶ 14.08, p. 14–32 (1981); Brief for Respondent 8. The IRS acquires whatever rights the taxpayer himself possesses. And in such circumstances, where, under

---

[9] The dissent's suggestion that these cases are "irrelevant," see *post*, at 744, n. 9, stems from its erroneous assumption that state law dictates the extent of the Government's power to levy. It does not, and these cases all stand for the proposition that a delinquent's state-law right to withdraw funds from the joint bank account is a property interest sufficient for purposes of federal law for the Government to levy the account, notwithstanding the fact that questions as to the ultimate ownership of the funds may be unresolved.

state law, a taxpayer has the unrestricted right to withdraw funds from the account, "it is inconceivable that Congress . . . intended to prohibit the Government from levying on that which is plainly accessible to the delinquent taxpayer-depositor." *United States* v. *First National Bank of Arizona*, 348 F. Supp., at 389. Accord, *United States* v. *Citizens & Southern National Bank*, 538 F. 2d, at 1107.[10] The taxpayer's right to withdraw is analogous in this sense to the IRS's right to levy on the property and secure the funds. Both actions are similarly provisional and subject to a later claim by a codepositor that the money in fact belongs to him or her.

### III

The Court of Appeals, however, applied state law beyond the point of that law's specification of the nature of the property right, and bound the IRS to certain consequences of state property law. Because under Arkansas garnishment law, a creditor of a depositor is not subrogated to the depositor's power to withdraw the account, the court reasoned that the IRS, too, could not stand in the depositor's shoes. This gloss, it seems to us, is contrary to the analysis and holding in *United States* v. *Bess*, 357 U. S. 51 (1958). The Court of Appeals adduced three principal justifications for its result. The first was its belief that under Arkansas law Roy did not have a sufficient property interest in the funds to support the levy. The second was its concern that Ruby and Neva might possess competing claims to the funds on deposit, and that the bank might be subject to claims asserted by them. The third was its stated conclusion that "levy is not normally

---

[10] We stress the narrow nature of our holding. By finding that the right to withdraw funds from a joint bank account is a right to property subject to administrative levy under § 6331, we express no opinion concerning the federal characterization of other kinds of state-law created forms of joint ownership. This case concerns the right to levy only upon joint bank accounts.

intended for use as against property . . . bearing on its face the names of third parties, and in which those third parties likely have a property interest." 726 F. 2d, at 1300.

We are not persuaded by any of these asserted justifications.

The Court of Appeals' conclusion that Roy did not possess "property [or] rights to property" on which the IRS could levy rested heavily on its understanding of the Arkansas law of creditors' rights, particularly those in garnishment. *Id.*, at 1295–1296. See *Hayden* v. *Gardner*, 238 Ark. 351, 381 S. W. 2d 752 (1964). As we have suggested, this misconceives the role properly played by state law in federal tax-collection matters. The question whether a state-law right constitutes "property" or "rights to property" is a matter of federal law. *United States* v. *Bess*, 357 U. S., at 56–57. Thus, the facts that under Arkansas law Roy's creditors, unlike Roy himself, could not exercise his right of withdrawal in their favor and in a garnishment proceeding would have to join his codepositors are irrelevant. The federal statute relates to the taxpayer's rights to property and not to his creditors' rights. The Court of Appeals would remit the IRS to the rights only an ordinary creditor would have under state law. That result "compare[s] the government to a class of creditors to which it is superior." *Randall* v. *H. Nakashima & Co.*, 542 F. 2d 270, 274, n. 8 (CA5 1976).

The Court of Appeals also was concerned that Ruby and Neva might have rights that are affected if the levy were honored. 726 F. 2d, at 1297–1300. This reasoning, however, runs counter to the observation above that a bank served with a notice of levy has two, and only two, possible defenses for failure to comply with the demand: that it is not in possession of property of the taxpayer, or that the property is subject to a prior judicial attachment or execution. As we have stated, neither defense is applicable here. That another party or parties may have competing claims to the accounts is not a legitimate statutory defense.

In its understandable concern for Ruby's and Neva's property interests, the Court of Appeals has ignored the statutory scheme established by Congress to protect those rights. Crucially, the administrative levy, as has been noted, is only a provisional remedy. "The final judgment in [a levy] action settles no rights in the property subject to seizure." *United States* v. *New England Merchants National Bank,* 465 F. Supp. 83, 87 (Mass. 1979). Other claimants, if they have rights, may assert them. Congress recognized this when the Code's summary-collection procedures were enacted, S. Rep. No. 1708, 89th Cong., 2d Sess., 29 (1966), and when it provided in § 7426 of the Code, 26 U. S. C. § 7426, that one claiming an interest in property seized for another's taxes may bring a civil action against the United States to have the property or the proceeds of its sale returned.[11] Congress also has provided, by § 6343(b), an effective and inexpensive administrative remedy for the return of the property. See

---

[11] The dissent would find support in *United States* v. *Stock Yards Bank of Louisville,* 231 F. 2d 628 (CA6 1956), and *Raffaele* v. *Granger,* 196 F. 2d 620 (CA3 1952). See *post,* at 743, n. 8. Both cases are clearly distinguishable. *Stock Yards Bank* concerned an attempted levy upon United States savings bonds, held in the names of husband and wife, to satisfy the husband's tax liability. Savings bonds, however, are different from joint bank accounts and possess "limitations and conditions . . . which are delineated by the terms of the contract and by federal law." 231 F. 2d, at 630. Furthermore, the case was decided prior to the enactment of § 7426, which was added to the Internal Revenue Code by the Federal Tax Lien Act of 1966, § 110(a), 80 Stat. 1142.

*Raffaele* v. *Granger* is even less on point. The decision there did not concern the propriety of a provisional remedy, but the final ownership of the property in question. The court held that under Pennsylvania law a husband and wife's joint bank account was held by them together as tenants by the entirety, and that therefore the Government could not use the money in the account to satisfy the tax obligations of one spouse. The fact that either spouse could withdraw the property did not mean that it could be used to satisfy either spouse's tax obligations. 196 F. 2d, at 622–623. The Government here does not claim otherwise; it merely asserts the right to levy on such property and have all third parties who claim to own it come forward and make their claim.

Treas. Reg. § 301.6343–1(b)(2), 26 CFR § 301.6343–1(b)(2) (1984).[12]

Congress thus balanced the interest of the Government in the speedy collection of taxes against the interests of any claimants to the property, and reconciled those interests by permitting the IRS to levy on the assets at once, leaving ownership disputes to be resolved in a postseizure administrative or judicial proceeding. See *United Sand & Gravel Contractors, Inc.* v. *United States,* 624 F. 2d 733, 739 (CA5 1980); *Valley Finance, Inc.* v. *United States,* 203 U. S. App. D. C. 128, 136–137, 629 F. 2d 162, 170–171 (1980), cert. denied *sub nom. Pacific Development, Inc.* v. *United States,* 451 U. S. 1018 (1981). Its decision that certain property rights must yield provisionally to governmental need should not have been disregarded by the Court of Appeals. Nor would the bank be exposed to double liability were it to honor the IRS levy. The Code provides administrative and judicial remedies for codepositors against the Government, and any attempt to secure payment in this situation from the bank itself would be contrary to the federal enforcement scheme.[13]

The Court of Appeals' final justification for its holding was its belief that an IRS levy "is not normally intended for use as

[12] We do not pass upon the constitutional questions that were addressed by the District Court, but not by the Court of Appeals, concerning the adequacy of the notice provided by § 6343(b) and § 7426 to persons with competing claims to the levied property. There is nothing in the sparse record in this case to indicate whether Ruby and Neva Reeves were on notice as to the levy, or as to what the Government's practice is concerning the notification of codepositors in this context. As the parties are free to address this issue on remand, the dissent's concerns on this score, see *post,* at 747–748, are decidedly premature.

[13] As a result, it may well be that any attempt to recover against the bank under state law would be pre-empted. We need not resolve that question, however, for, under Arkansas law, the bank's payment to one depositor was a complete defense against suit on a codepositor's claim. Ark. Stat. Ann. §§ 67–521, 67–552 (h) (1980). Since the Government stood in Roy's shoes when it levied upon the joint account, the bank's payment to the IRS would likewise insulate the bank from actions by Roy's codepositors.

against property in which third parties have an interest" or "as against property bearing on its face the names of third parties, and in which those third parties likely have a property interest." 726 F. 2d, at 1300. The court acknowledged the existence of § 7426 but felt that that statute was designed to protect only those third parties "whose property has been seized 'inadvertently.'" 726 F. 2d, at 1300.

We disagree. The IRS's understanding of the terms of the Code is entitled to considerable deference. Here, moreover, collection provisions plainly contemplate that a taxpayer's interest in property may be less than full ownership. The tax lien attaches not only to "property" but also to "rights to property." See S. Rep. No. 1708, at 29. Further, we see nothing in the language of § 7426 that distinguishes among various species of third-party claimants. The language of the statute encompasses advertent seizures as well as inadvertent ones.[14] There is nothing express or

---

[14] The dissent's central argument apes the decision of the Court of Appeals in suggesting that there is something in the language of § 6331 that, when compared to the language of § 7403, requires that it be read to apply only to the case where the Government has proof that the property levied upon *"completely* belong[s]" to the delinquent. See *post*, at 741 (emphasis added). The adverb, however, simply is not part of the statutory language. The dissent bases its reading on the contrast between the language in § 7403, "property . . . in which [the delinquent] has any right, title, or interest," with the language in § 6331, "property and rights to property . . . belonging to the delinquent." See *post*, at 737–741. While the dissent's reading of the statutes in contrast is plausible, so too is the Government's, especially in light of the fact that § 6331 refers to "rights to property" as well as "property." The legislative history also supports the agency's understanding of the statutory language. Thus when Congress in § 7426 enacted a cause of action for one whose property was wrongfully levied, it explicitly recognized that it was protecting against the situation "where the Government levies on property which, *in part at least,* a third person considers to be his." S. Rep. No. 1708, 89th Cong., 2d Sess., 29 (1966) (emphasis added). If Congress intended § 6331 to give the Government the power to levy only upon property it knows to be wholly owned by the delinquent, it never would have felt the need to enact § 7426. When the agency's plausible interpretation of its statute is supported by the plain meaning of the statute, the statutory scheme as a whole, and the

implied in *United States* v. *Rodgers*, 461 U. S. 677 (1983), to the contrary.

*Rodgers* held that § 7403 empowers a district court to order the sale of a family house in which a delinquent taxpayer has an interest, even though a nondelinquent spouse also has a homestead interest in the house under state law. 461 U. S., at 698–700. In so ruling, the Court contrasted the operation of § 7403 with that of § 6331. See 461 U. S., at 696. The Court noted that § 6331, unlike § 7403, does not "implicate the rights of third parties," because an administrative levy, unlike a judicial lien-foreclosure action, does not determine the ownership rights to the property. Instead, third parties whose property is seized in an administrative levy "are entitled to claim that the property has been 'wrongfully levied upon,' and may apply for its return either through administrative channels . . . or through a civil action." *Ibid.* The Court, in other words, recognized what we now make explicit: that § 6331 is a *provisional* remedy, which does not determine the rights of third parties until *after* the levy is made, in postseizure administrative or judicial hearings.[15]

---

legislative history, we shall not reject it because another plausible reading of the statute is possible.

The dissent also is incorrect when it implies that the Court gives the word "wrongful" a strained understanding in finding that a third party's property could be "wrongful[ly]" levied even though the Government properly was following the procedures of § 6331. See *post*, at 746, n. 11. The legislative history makes clear that the word "wrongful" as it is used in § 7426(a) refers not to intentional wrongdoing on the Government's part, but rather "refers to a proceeding against property which is not the taxpayer's." S. Rep. No. 1708, at 30.

[15] The dissent's misreading of *Rodgers* is of a piece with its misunderstanding of the Government's use of § 6331 as a provisional remedy to seize property. See *post*, at 740–743, and n. 6. The reason that § 6331 is not itself "punctilious in protecting the vested rights of third parties caught in the Government's collection effort," *Rodgers*, 461 U. S., at 699, is that the levy does not purport to determine any rights to the property. It merely protects the Government's interests so that rights to the property may be determined in a postseizure proceeding. It is in those proceedings that the rights of any who claim an interest to the property are punc-

The Court of Appeals' result would force the IRS, if it wished to pursue a delinquent taxpayer's interest in a joint bank account, to institute a lien-foreclosure suit under § 7403, joining all codepositors as defendants. The practical effect

---

tiliously protected. In comparing § 6331 to § 7403 in this manner, the dissent compares apples and oranges. A more telling comparison to the lien-foreclosure proceeding of § 7403 would be with the administrative and judicial remedies for third parties whose property has been subject to wrongful levy, that is, with §§ 6343(b) and 7426(a)(1). It was just such a comparison that was made in this context by the Court in *Rodgers.* See *id.*, at 696. ·

Nor is *Mansfield* v. *Excelsior Refining Co.,* 135 U. S. 326 (1890) (which not surprisingly was not relied on by the District Court or the Court of Appeals or by any of the parties here), in any way related to our holding today. That case involved provisions of the 1868 Tax Code that required a distiller who rented the property upon which it ran its distillery to obtain a "waiver" from the feeholder stipulating that a lien of the United States on the property for taxes owed by the distiller shall have priority over any mortgage held by the person executing the waiver, and giving the Government the rightful title to the property in case of forfeiture. Act of July 20, 1868, ch. 186, § 8, 15 Stat. 128. See 135 U. S., at 328–329, 338–339. The Court held that this waiver did not entitle the Government to treat the property as if it belonged to the distiller for purposes of the then Tax Code's levy provisions. *Id.,* at 338. The waiver, the Court held, did not give the distiller a fee interest in the premises, nor did it give the Government the right to anything more than a first or prior lien. *Id.,* at 339. That holding is irrelevant to the present controversy. Insofar as the case stands for any general proposition at all concerning the Government's power to levy, it is *not* that a levy cannot be used to freeze assets when the delinquent "had less than a complete interest" in the property levied, see *post,* at 738, but that the Government may not levy upon a leasehold interest and then turn around and sell a fee interest—an entirely different kind of interest. In *Mansfield,* the Court held that the delinquent held no interest in the fee that could be levied upon, and so that case has nothing to do with the question whether the Government can levy when the extent of the delinquent's interest in the property is not finally determined. The part of the decision relied upon by the dissent has to do with the nature of the "waiver" as it affects the characterization of the interest held by the renter/distiller in the underlying fee. The phrase cited by the dissent in context stands for the proposition that the waiver did not give the delinquent a fee interest that the Government could levy upon, but rather gave the Government the right to foreclose on its lien through a suit in equity.

of this would be to eliminate the alternative procedure for administrative levy under §§ 6331 and 6332. We do not lightly discard this alternative relief that Congress so clearly has provided for the Government. If the IRS were required to bring a lien-foreclosure suit each time it wished to execute a tax lien on funds in a joint bank account, it would be uneconomical, as a practical matter, to do so on small sums of money such as those at issue here. And it would be easy for a delinquent taxpayer to evade, or at least defer, his obligations by placing his funds in joint bank accounts. While one might not be enthusiastic about paying taxes, it is still true that "taxes are the life-blood of government, and their prompt and certain availability an imperious need." *Bull* v. *United States*, 295 U. S. 247, 259 (1935).

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE POWELL, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, dissenting.

The issue presented is whether the Internal Revenue Service (IRS) may lawfully seize a joint bank account for payment of a single codepositor's delinquent taxes when it does not know how much, if any, of the account belongs to the delinquent. As it seems to me that the Court today misreads the relevant statutory language, in effect overrules prior decisions of this Court, and substantially ignores the property rights of nondelinquent taxpayers, I dissent.

I

The parties have stipulated the following facts. On June 13, 1980, respondent bank held $321.66 in a checking account and $1,241.60 in a savings account, each in the names of "Roy Reeves or Ruby Reeves or Neva R. Reeves." App. 11–12. Under state law and by contract with the bank, each of these individuals could withdraw any amount from either account. Also on June 13, the IRS served a notice of levy on the bank demanding that it pay over all sums owed to Roy J. Reeves

up to $1,302.56, the balance of a tax assessment against him. It later issued a partial release of levy for moneys in excess of $856.61 and served a final demand for payment on the bank. The bank, however, refused to pay over this amount because it did not know how much of the money in the accounts belonged to Roy Reeves as opposed to Ruby and Neva. The Government, to enforce its levy, then sued the bank for $856.61. Before the District Court the parties agreed to submit "[n]o further evidence as to the ownership of the monies in the subject bank accounts . . . ." App. 17. As a result, neither the Government nor the Court knows how much of the funds in each account was owned by each codepositor.

The District Court dismissed the complaint as "premature." 554 F. Supp. 110, 117 (ED Ark. 1982). It held that "the interest of [a] co-depositor in not having his ownership interest in the account erroneously taken by the government . . . [required] some notice procedure at the levy stage . . . ." *Id.*, at 114. Due process, it found, required the IRS to give codepositors notice of the levy action before seizing the accounts. *Id.*, at 114–115. The Court of Appeals for the Eighth Circuit affirmed without expressing any opinion on the District Court's due process analysis. 726 F. 2d 1292 (1984). Instead, it reached a similar result as a matter of statutory construction. In particular, it held that the Government had not shown the bank to be in possession of property or rights to property belonging to the tax delinquent, as the levy statute requires.

## II

Because "taxes are the life-blood of government, and their prompt and certain availability an imperious need," *Bull* v. *United States*, 295 U. S. 247, 259 (1935), Congress has created a "formidable arsenal of collection tools . . . ," *United States* v. *Rodgers*, 461 U. S. 677, 683 (1983). Central to this "arsenal" are administrative levy, 26 U. S. C. § 6331, and judicial foreclosure, § 7403, two procedures by which the Government can seize and sell property in which the delinquent taxpayer has an interest. Each procedure is designed

to apply to specific kinds of situations to ensure that taxes owed are paid while respecting the rights of nondelinquents who may have an interest in the property.

The Court today, however, ignores the property rights of nondelinquents. It holds that a delinquent's right to compel payment from a bank of balances in a joint account entitles the Government to levy on all of those funds—even when it is stipulated, as in this case, that the Government does not know that *any* of the money in the account actually belongs to the delinquent. By so holding, the Court disregards both the plain language and structure of the statute, ignores this Court's century-long interpretation of the Code (effectively overruling *Mansfield* v. *Excelsior Refining Co.*, 135 U. S. 326 (1890), and part of *United States* v. *Bess*, 357 U. S. 51 (1958)), and disregards the fact that under Arkansas law a codepositor may have no property interest in funds that he may withdraw from the joint account.

## III

Administrative levy under 26 U. S. C. § 6331 is the more drastic of the Government's two primary collection procedures.[1] See *Bull* v. *United States*, *supra*, at 259–260. By allowing the Government summarily to seize and sell "all property and rights to property . . . belonging to [the delinquent]," 26 U. S. C. § 6331(a), administrative levy permits the IRS to collect unpaid taxes without judicial intervention.

---

[1] Section 6331 provides in pertinent part:

"(a) Authority of Secretary

"If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary to collect such tax . . . by levy upon all property and rights to property . . . belonging to such person . . . .

"(b) Seizure and sale of property

"The term 'levy' . . . includes the power of distraint and seizure by any means. . . . In any case in which the Secretary may levy upon property or rights to property, he may seize and sell such property or rights to property (whether real or personal, tangible or intangible)."

It is a "summary, non-judicial process, a method of self-help authorized by statute which provides the Commissioner with a prompt and convenient method for satisfying delinquent tax claims." *United States* v. *Sullivan*, 333 F. 2d 100, 116 (CA3 1964). It provides no notice to third parties that property in which they may have an interest has been seized. If an individual discovers a levy and believes that it was wrongful, his or her only recourse is to seek administrative review under 26 U. S. C. § 6343(b) within nine months[2] or file suit in federal district court under 26 U. S. C. § 7426(a)(1) within the same amount of time.[3]

Section 7403 provides a quite different method for collecting delinquent taxes.[4] Under § 7403, the Attorney General,

---

[2] Section 6343(b) states in pertinent part:

"If the Secretary determines that property has been wrongfully levied upon, it shall be lawful for the Secretary to return—

"(1) the specific property levied upon,

"(2) an amount of money equal to the amount of money levied upon, or

"(3) an amount of money equal to the amount of money received by the United States from a sale of such property.

"Property may be returned at any time. An amount equal to the amount of money levied upon or received from such sale may be returned at any time before the expiration of 9 months from the date of such levy."

[3] Section 7426(a)(1) provides as follows:

"If a levy has been made on property or property has been sold pursuant to a levy, and any person (other than the person against whom is assessed the tax out of which such levy arose) who claims an interest in or lien on such property and that such property was wrongfully levied upon may bring a civil action against the United States in a district court of the United States. Such action may be brought without regard to whether such property has been surrendered to or sold by the Secretary."

Section 6532(c)(1) requires third parties who are not seeking administrative review to file suit within nine months of the levy.

[4] Section 7403 provides in pertinent part as follows:

"(a) Filing

"In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary, may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect

at the request of the Secretary of the Treasury, institutes a civil action in federal district court "to subject any property . . . in which [the delinquent] has any right, title, or interest, to the payment of such tax." 26 U. S. C. § 7403(a). All persons "claiming any interest in the property" must be joined as parties, § 7403(b), and "duly notified of the action," § 7403(c). Unlike a § 6331 levy, a § 7403 suit is a plenary action in which the court "adjudicate[s] all matters involved" and "finally determine[s] the merits of all claims to and liens upon the property." § 7403(c). The district court may decree the sale of the property and distribution of the proceeds "according to the findings of the court in respect to the interests of the parties and of the United States." *Ibid.*

The language of these two provisions reveals the central difference between them. While § 6331 applies to "property and rights to property . . . belonging to [the delinquent]," § 6331(a), § 7403 applies to "property . . . in which [the delinquent] has any right, title, or interest . . . ," § 7403(a). In other words, § 6331 permits seizure and sale of property or property rights *belonging to* the delinquent, while § 7403 allows the Government to seize and sell any property right in which the delinquent has an interest—even a *partial* interest. In many cases, of course, this difference is unimportant. Both procedures, for example, apply to any property

---

to such tax or liability or to subject any property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability. . . .

"(b) Parties

"All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.

"(c) Adjudication and decree

"The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property . . . and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States. . . ." 26 U. S. C. § 7403.

interest that belongs completely to the delinquent, for it is necessarily true that any right to property "belonging to" the delinquent is also property in which he "has a[n] . . . interest." In general, however, the opposite is not always true. A property right in which the delinquent has only a partial interest does not "belon[g] to" the delinquent and hence is not susceptible to levy.

Until today, this Court has followed this interpretation of the levy and foreclosure provisions for the past century. In *Mansfield* v. *Excelsior Refining Co.*, 135 U. S. 326 (1890), the Court held that the Government could not levy on property rights in which a delinquent had less than a complete interest. In that case, the Government had levied on the fee interest in property that the delinquent had leased for a term of years. One issue presented was whether the Government's subsequent sale of the property conveyed the freehold or only the leasehold interest. The first Justice Harlan analyzed the issue as follows:

> "The government neglected to pursue the only mode by which the fee could be sold; namely, a suit in equity, in which all persons interested in the property could have been made parties. When the [delinquent] was in default in respect to taxes, it was for the proper officers of the government to elect whether they would seek satisfaction of its demands by means of a seizure and sale by the collector of the [delinquent's] interest only, or by a suit to which all persons having claims upon the premises on which the government had a lien should be made parties. They chose to adopt the former method, under which only the interest of the delinquent . . . could be seized and sold." *Id.*, at 341.

In other words, the Government could have either levied administratively only on the leasehold or proceeded in equity (the forerunner of § 7403) to condemn the entire freehold interest. Under the former approach, it could take only the interest that completely "belong[ed] to" the delinquent, while

under the latter, it could take property interests of which the delinquent owned only a part.[5]   Accord, *Blacklock* v. *United States*, 208 U. S. 75 (1908).

In *United States* v. *Rodgers*, 461 U. S. 677 (1983), we recently reaffirmed this understanding of the statutory scheme.   After noting that § 7403 exhibits "grea[t] solicitude for third parties," *id.*, at 695, we discussed how §§ 6331 and 7403 differ:

> "Under . . . § 6331(a), the Government may sell for the collection of unpaid taxes all nonexempt 'property and rights to property . . . *belonging to [the delinquent taxpayer]* . . . .'   Section 6331, unlike § 7403, does not require notice and hearing for third parties, *because no rights of third parties are intended to be implicated by § 6331.*   Indeed, third parties whose property or interests in property have been seized inadvertently are entitled to claim that the property has been 'wrongfully levied upon,' and may apply for its return either through administrative channels . . . or through a civil action filed in a federal district court. . . . In the absence of such 'wrongful levy,' the entire proceeds of a sale conducted pursuant to administrative levy may be applied, without any prior distribution of the sort required by

---

[5] The Court argues that *Mansfield* is irrelevant to today's decision because it stands for the unremarkable proposition that "the Government may not levy upon a leasehold interest and then turn around and sell a fee interest—an entirely different kind of interest." *Ante*, at 732, n. 15. It bases this reading of *Mansfield* on the presence of a waiver from the feeholder, which was in fact tangential to the Court's holding in that case. The Court in *Mansfield* discussed the feeholder's waiver only in order to determine whether it gave the Government an interest in the fee.   135 U. S., at 338–339.   If it did, it was clear that the Government could sell the fee.   The Court, however, concluded that the waiver gave the Government no such interest.   *Id.*, at 339.   Thus, the Court had to consider whether the levy on the property could *by itself* effectively transfer more than the delinquent's leasehold interest.   Justice Harlan, writing for the *Mansfield* Court, found that the levy could not, and it is in this respect that *Mansfield* is a highly pertinent—if not a controlling—authority.

§ 7403, to the expenses of the levy and sale, the specific tax liability on the seized property, and the general tax liability of the delinquent taxpayer." *Id.*, at 696 (first emphasis in original, second added).

The Court later described the various advantages of each method of tax collection as follows:

"Among the advantages of administrative levy is that it is quick and relatively inexpensive. Among the advantages of a § 7403 proceeding is that it gives the Federal Government the opportunity to seek the highest return possible on the forced sale of property interests liable for the payment of federal taxes. The provisions of § 7403 are broad and profound. *Nevertheless, § 7403 is punctilious in protecting the vested rights of third parties caught in the Government's collection effort*, and in ensuring that the Government not receive out of the proceeds of the sale any more than that to which it is properly entitled." *Id.*, at 699 (emphasis added).[6]

---

[6] The Court attempts to minimize the conflict between its holding today and the holding in *Rodgers* by mischaracterizing that case. The Court states that "[t]he *[Rodgers]* Court noted that § 6331, unlike § 7403, does not 'implicate the rights of third parties,' because an administrative levy, unlike a judicial lien-foreclosure action, does not determine the ownership rights to the property." *Ante*, at 731. Nothing in *Rodgers*, however, suggests that § 6331 is not intended to implicate third-party rights for this reason. As the first quotation from *Rodgers* in the text above clearly indicates, § 6331 is not meant to implicate such rights because its explicit language limits levies for "unpaid taxes [to] all nonexempt 'property and rights to property . . . *belonging to [the delinquent taxpayer]* . . .'" (emphasis in *Rodgers*).

The Court also argues that comparing § 6331 and § 7403 is like comparing "apples and oranges." *Ante*, at 732, n. 15. It suffices to say that this Court always has relied on comparison of these two provisions. See *United States* v. *Rodgers*, 461 U. S., at 695–697; *Mansfield* v. *Excelsior Refining Co.*, 135 U. S., at 341. Furthermore, the "more telling" comparison that the Court believes *Rodgers* made between § 7403 and a wrongful-levy action, see *ante*, at 731–732, n. 15, actually works against today's

As *Mansfield* and *Rodgers* make clear, this Court long has interpreted "property and rights to property *belonging to* the delinquent" to mean exactly that. Section 6331's reach extends only to property rights completely belonging to the delinquent.

## IV

The narrow question presented, then, is whether the Government levied upon property or rights to property belonging only to Roy Reeves. The Court holds that the Government did so because it levied on Roy Reeves' right under state law to require the bank to pay over to him the outstanding balances in the accounts. This right unquestionably belonged to Roy Reeves, as it did to each of the other codepositors. They all had the same right to withdraw. But the right to withdraw funds was no more than that. It was a right accorded parties to joint accounts as a matter of mutual convenience, and it was independent of any right *to* or *in* the property. It encompassed no right of possession, use, or ownership over the funds when withdrawn. See *Black* v. *Black*, 199 Ark. 609, 617, 135 S. W. 2d 837, 841 (1940); *Hayse* v. *Hayse*, 4 Ark. App. 160–B, 160–F, 630 S. W. 2d 48, 49–50 (1982). These property rights, which the levy provides no way of determining, are defined by independent principles of Arkansas law that are not now at issue.[7]

---

result. By stating that wrongful-levy actions can be pursued when "property ha[s] been seized inadvertently," 461 U. S., at 696, the *Rodgers* Court makes clear its assumption that the Government cannot levy on property it knows may belong to third parties. The reasoning of the Court today, however, would allow exactly this result.

[7] The Arkansas Supreme Court has described the statute granting co-depositors the right to withdraw in the following terms:

"[The statute was] passed for the protection of the bank in which the deposit was made. It permits the bank to pay out the deposit . . . and protects the bank in doing so. . . . The statute[, however,] effects no investiture of title as between the depositors themselves, but only relieves the bank of the responsibility and duty of making inquiry as to the respec-

The Government, however, is not levying on the mere right to withdraw, which is of little value without any right of ownership. The levy at issue reaches the underlying funds in the accounts—no matter whom they belong to. Roy Reeves could, as the Court argues, have withdrawn all the joint funds, but, if under state law he had no independent right in the property itself, he could not legally possess the funds of the others, let alone use them to pay *his* taxes. That the delinquent might unlawfully convert the money of others to pay his taxes does not give the Government the right to do so. The Government cannot " " "ste[p] into the taxpayer's shoes," " " *ante*, at 725, quoting *United States* v.

---

tive interests of the depositors in the deposit . . . ." *Black* v. *Black*, 199 Ark. 609, 617, 135 S. W. 2d 837, 841 (1940).

The Court of Appeals accepted this characterization of Arkansas law and described the interrelationship between the right to withdraw and the underlying property rights as follows:

"Roy [Reeves] could have withdrawn any amount he wished from the account and used it to pay his debts, including federal income taxes, and his co-owners would have had no lawful complaint against the bank. But they might have had a claim against Roy for conversion. The rights of the co-owners *inter sese* are not determined by the . . . Arkansas statutes [granting a right of withdrawal]. Those rights depend on the intention of whoever deposited the money, or on whatever agreement, if any, might have been made among the co-owners, or on some other applicable rule of state law. If, for example, a spouse makes a deposit in a bank account that bears both spouses' names, a tenancy by the entirety is created, defeasible by either spouse at will simply by making a withdrawal. But here we do not know whether Roy is married to Ruby or Neva. In fact, both the government and the bank have studiously avoided finding out. . . . In short, we know, or presume, that each co-owner could withdraw all of both accounts, *but that is all we know*." 726 F. 2d 1292, 1295 (CA8 1984) (citation omitted) (emphasis added).

The Court accepts, as it must, the state court's determination of Arkansas law. It simply holds that federal law overrides it, despite what this Court has held in *Aquilino* v. *United States*, 363 U. S. 509, 513 (1960), quoting *Morgan* v. *Commissioner*, 309 U. S. 78, 82 (1940); *United States* v. *Bess*, 357 U. S. 51, 55 (1958); see *ante*, at 726–729.

*Rodgers*, 461 U. S., at 691, n. 16, in this sense. It hardly comports with the "[c]ommon sense" the Court relies on, *ante*, at 725, to hold that the Government may seize and sell property belonging only to third parties to pay taxes owed by the delinquent.[8]

The Court nevertheless holds that the right to withdraw all of a joint account is determinative because "'it is inconceiv-

---

[8] The Courts of Appeals that have considered whether the IRS can levy on jointly held property to pay a co-owner's taxes have held that it cannot when it does not know how much of the property actually belongs to the delinquent. In *United States* v. *Stock Yards Bank of Louisville*, 231 F. 2d 628 (CA6 1956), Justice (then Judge) Stewart, writing for the court, held that a joint bondholder's right to present a bond for redemption, receive payment in full, and thereby eliminate completely the other co-owner's interest as far as the issuer was concerned did not give the IRS the right to levy on the entire bond to pay one co-owner's taxes. "Proof of the actual value of the taxpayer's interest was an essential element of the government's case under the statute, and for lack of such proof the case falls." *Id.*, at 631. The Court attempts to distinguish this case on the ground that "[s]avings bonds . . . are different from joint bank accounts . . . ." *Ante*, at 728, n. 11. In *Stock Yards Bank*, however, the Court of Appeals expressly analogized savings bonds to joint bank accounts, 231 F. 2d, at 631, and the Court today points to no relevant distinguishing feature. It merely creates a distinction without a difference.

Likewise, in *Raffaele* v. *Granger*, 196 F. 2d 620 (CA3 1952), the Court of Appeals rejected the IRS's view that it could levy on joint bank accounts held as tenancies by the entirety when "either spouse may draw upon them." *Id.*, at 622. The court found that the "power of each spouse to withdraw funds," which the IRS argued was determinative, *ibid.*, was actually irrelevant because under state law "the ownership of both [spouses] attaches to funds withdrawn by either," *ibid.* "The United States," it held, "has no power to take property from one person, the innocent spouse, to satisfy the obligation of another." *Id.*, at 623. The Court attempts to distinguish this case on the ground that it "did not concern the propriety of a provisional remedy, but the final ownership of the property in question." *Ante*, at 728, n. 11. This is misleading. In *Raffaele*, the Court of Appeals affirmed the District Court's quashing of a warrant of distraint. It thus held that the IRS had no right to seize the property as an initial matter. It did not hold that the IRS had properly seized the property but had to return it.

able that Congress . . . intended to prohibit the Government from levying on that which is plainly *accessible* to the delinquent taxpayer-depositor.'"[9]  *Ante,* at 726, quoting *United*

---

[9] The Court today states that "[t]he overwhelming majority of courts that have considered the issue have held that a delinquent taxpayer's unrestricted right to withdraw constitutes 'property' or 'rights to property' subject to provisional IRS levy, regardless of the facts that other claims to the funds may exist and that the question of ultimate ownership may be unresolved at the time." *Ante,* at 724–725.  Insofar as the Court states that the IRS can levy on the right to withdraw, one can assume, without deciding, that it is correct, because the statement is irrelevant.  In the present case, the IRS is not levying on the right to withdraw, but on the underlying right in the property, which may well belong to innocent third parties.  See *supra,* at 741–743.  On the other hand, insofar as the Court states that "these cases all stand for the proposition that a delinquent's state-law right to withdraw funds from [a] joint bank account is a property interest sufficient for purposes of federal law for the Government to levy the account . . . ," *ante,* at 725, n. 9, it is simply mistaken.  *Not one, let alone "all," of these cases stand for this proposition.*  The cases the Court cites from the Courts of Appeals, the District Courts, and the Tax Court either decide a different question or actually support the position taken by the Third and Sixth Circuits, see n. 5, *supra.*  Four of the Court of Appeals cases and one of the District Court cases concern the amount of "property" in an individual's account when the bank has either an unexercised right of setoff or checks still to be drawn against the account at the time of the levy.  *Citizens & Peoples National Bank* v. *United States,* 570 F. 2d 1279 (CA5 1978) (unpaid checks); *United States* v. *Citizens & Southern National Bank,* 538 F. 2d 1101 (CA5 1976) (unexercised right of setoff), cert. denied, 430 U. S. 945 (1977); *United States* v. *Sterling National Bank & Trust Co.,* 494 F. 2d 919 (CA2 1974) (same); *Bank of Nevada* v. *United States,* 251 F. 2d 820 (CA9 1957) (same), cert. denied, 356 U. S. 938 (1958); *United States* v. *First National Bank of Arizona,* 348 F. Supp. 388 (Ariz. 1970) (same), aff'd, 458 F. 2d 513 (CA9 1972).  The fifth Court of Appeals case, the other District Court case, and all the Tax Court cases support a holding opposite to the Court's today.  In *Babb* v. *Schmidt,* 496 F. 2d 957 (CA9 1974), for example, the court allowed the levy against community property only because state law "ha[d] . . . given the [delinquent] rights in that property . . . ." *Id.,* at 960.  And in the other District Court case and all the Tax Court cases the court found that state law gave the delinquent not only a right of withdrawal but also a right of use or possession in the underlying funds themselves.  *United States* v. *Third National Bank & Trust Co.,* 111 F. Supp. 152, 155 (MD Pa. 1953) (delinquent was either sole owner of

*States* v. *First National Bank of Arizona*, 348 F. Supp. 388, 389 (Ariz. 1970) (emphasis added), aff'd, 458 F. 2d 513 (CA9 1972) *(per curiam)*. By holding that mere accessibility controls, the Court simply ignores the plain language of § 6331. It also effectively overrides state law that " 'controls in determining the nature of the legal interest which the taxpayer ha[s] in the property.' " [10] *Aquilino* v. *United States*,

funds or joint tenant); *United States* v. *Equitable Trust Co.*, 49 AFTR 2d ¶ 82–428, at 82–725 (Md. 1982) ("[P]rior to the federal tax levy, both [codepositors] owned the accounts as joint tenants, each having the absolute right to use or withdraw the entire fund. . . . Consequently, [the delinquent codepositor] had property rights in the checking account . . . ."); *Sebel* v. *Lytton Savings & Loan Assn.*, 65–1 USTC ¶ 9343 (SD Cal. 1965) (joint tenancy); *Tyson* v. *United States*, 63–1 USTC ¶ 9300 (Mass. 1962) (holding in the alternative that assessment was jointly against both codepositors or that state law granted any creditor the right to possession of either codepositor's funds).

These cases should also dispel the Court's fear that the IRS will be forced to "bring a lien-foreclosure suit each time it wishe[s] to execute a tax lien on funds in a joint bank account . . . ." *Ante*, at 733. Nothing in my opinion suggests that under existing federal law the IRS can *never* levy on a joint bank account. As the cited cases make clear, many, if not most, States give codepositors property rights in *all* the funds in a joint account. As long as state law grants such a right—which Arkansas law does not, see n. 7, *supra*—levy on all the funds to pay a single codepositor's taxes is proper. It is only when state law does not grant such a right that the IRS should not be allowed to levy under § 6331 without first determining that the funds "belong to" the delinquent. The Court's position, however, would permit levies even when the IRS knows that none of the funds in the account belongs to the delinquent taxpayer.

[10] At several points, the Court mischaracterizes my reliance on state law. I do not suggest that because state law "puts certain limits on the rights of creditors, and attaches certain consequences to [the right to withdraw] as regards the delinquent himself . . . the Government is limited by these same state-law constraints." *Ante*, at 724, n. 8. Nor do I suggest that "state law dictates the extent of the Government's power to levy." *Ante*, at 725, n. 9. These are strawmen that the Court long ago rejected. *United States* v. *Bess*, 357 U. S., at 56–57. Like the Court, I would follow the statement in *Bess* that § 6331 "creates no property rights but merely attaches consequences, federally defined, *to rights created under state law* . . . ." *Id.*, at 55 (emphasis added). As the Court today states, "under *Bess*, state law controls only in determining the nature of the legal

363 U. S. 509, 513 (1960), quoting *Morgan* v. *Commissioner*, 309 U. S. 78, 82 (1940); *United States* v. *Bess*, 357 U. S., at 55. Under the Court's reasoning, for example, a codepositor's right to withdraw would allow the Government to levy on a joint account even if the Government knew that under state law none of the funds in the joint account "belonged to" the delinquent codepositor, *i. e.*, the delinquent had *no* property interest in the funds themselves.[11] Cf. *Aquilino* v. *United States, supra,* at 513, n. 3 ("It would indeed be anomalous to say that the taxpayer's 'property and rights to property' included property in which, under the relevant state law, he had no property interest at all"). Such a position exceeds even the IRS's own interpretation of its

---

interest which the taxpayer has in the property." *Ante,* at 724, n. 8. Here, however, the delinquent taxpayer may have *no* legal interest in the property. All that is known is that he has a right of withdrawal that is completely independent of the funds themselves. See n. 7, *supra.* Nevertheless, the Court attaches "federal consequences" sufficient to levy on the accounts. In effect, what the Court holds today is that the delinquent's right against the bank creates "federal consequences" that attach to the completely different right to the funds themselves. By so construing the "federal consequences" of *Bess,* the Court does nothing less than rewrite § 6331, a provision that authorizes levy *only* on "property and rights to property belonging to" the delinquent.

[11] Moreover, if taken seriously, the Court's reasoning would make any action for wrongful levy fruitless. If the mere right to withdraw payment is indeed the determinative interest, then a levy on a joint account for payment of a codepositor's taxes can never be wrongful. It will always be true that a right to withdraw belonged to the delinquent codepositor. The Court, of course, does not actually take this extreme position. It would apparently allow a third party subsequently to contest a levy on the ground that "the money in fact *belongs to* him or her." *Ante,* at 726 (emphasis added). This, however, amounts to recognition that it is the right of ownership, rather than the right to withdraw, that controls. To avoid taking a transparently unreasonable position, the Court switches the basis of its analysis. The relevant property interest, it appears, depends upon whether the Government is trying to seize property or a third party is trying to recoup it. The Court offers no reason for applying this double standard, and the statute itself yields none.

levy powers.  Rev. Ruling 55–187, 1955–1 Cum. Bull. 197 ("A joint checking account is subject to levy only to the extent of a taxpayer's interest therein, which will be determined from the facts in each case").  This position, moreover, effectively overrules not only *Mansfield* but also part of *United States* v. *Bess, supra*, a case in which this Court held that a delinquent could have no "property or right to property" in funds over which he had no right of possession.  357 U. S., at 55–56.

The Court also disregards the statutory language and its prior cases when it argues that the levy authorized by § 6331 is only a "provisional" remedy.  *Ante*, at 715, 720, 726, and 728.  Third parties who have their property taken may pursue—if they know about the taking—either administrative or judicial relief.  But one would hardly characterize as "provisional" the Government's taking of an innocent party's property without notice, especially when, even if the taking is discovered, the burden is then on the innocent party to institute recovery proceedings.[12]  Furthermore, absent notice of any kind, the nine months that the administrative, 26 U. S. C. § 6343(b), and judicial, 26 U. S. C. § 6532(c)(1), remedies ordinarily give third parties to contest a levy is a short time indeed.  There is no certainty that within this time they will discover that their property has been used to pay someone else's taxes.  This may be particularly true as

---

[12] The Court also argues that a levy on third-party property may be justified because "[the levy] merely protects the Government's interests so that rights to the property may be determined in a postseizure proceeding." *Ante*, at 731, n. 15.  This statement incorrectly states the law.  Under the levy statute, the IRS has the power not only to seize but also to sell property.  26 U. S. C. § 6331(b).  A co-owner of a house seized and sold to pay a delinquent's taxes would indeed be surprised to discover that the IRS's levy "merely protects the Government's interests . . . ."  Assuming that the co-owner discovered within nine months that the IRS had levied on the property (for no notice to him is required), he could recover in a wrongful-levy action at most some of the proceeds from the sale.  This "remedy" hardly "punctiliously protect[s]" the rights of third parties, as the Court claims.  *Ante*, at 731–732, n. 15.

to the owners of joint *savings* accounts, owners in common of unimproved real estate, and owners in other situations where there may be little occasion to know that one's property has been seized by an IRS levy. In short, the Court's decision often will place the property rights of third parties in serious jeopardy.[13]

## V

On the stipulated facts, the IRS did not know what portion, if any, of the joint accounts levied upon "belong[ed] to" Roy Reeves. It knew only that he had a right to withdraw that under state law encompassed no right to the possession, use, or ownership of the funds when withdrawn. In allowing the levy under these circumstances, the Court today not only decides this case contrary to all of the relevant decisions of the Courts of Appeals but also effectively overrules *sub silentio* its own prior decisions. Moreover, the Court relies on remedies that, because no notice is provided, may in many cases prove ineffective in protecting the rights of third parties.[14]

I accordingly dissent, and would affirm the judgment of the Court of Appeals.

---

[13] The Court also emphasizes that administrative levy is justified because, like the delinquent's right to withdraw, it is "subject to a later claim by a codepositor that the money in fact belongs to him or her." *Ante*, at 726. This statement proves too much. Under the Court's reasoning, the IRS could levy on anyone's property to pay anyone else's taxes because such wrongful seizures are nearly always "subject to a later claim by [the owner] that the [property] in fact belongs to him or her." The fact that every wrongful taking is subject to a subsequent claim for conversion does not justify the taking.

[14] The IRS may reach funds like these by following the procedure prescribed by § 7403. And, of course, Congress, if it wishes, may authorize collection of funds under a levy-type procedure, provided it observes constitutional requirements, particularly that of notice. As I would find the statutory language dispositive (as did the Court of Appeals), I do not address the due process claim relied on by the District Court.