Linda HAMILTON, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. No. N–90–128 (TFGD).

United States District Court,
D. Connecticut.

Aug. 28, 1992.

V. James Ferraro, New Haven, Conn., for plaintiff.

Scott H. Harris, U.S. Dept. of Justice, Tax Div., John B. Hughes, U.S. Atty's Office, New Haven, D. Conn., Albert S. Dabrowski, U.S. Atty., Hartford, Conn. for defendant.

## MEMORANDUM OF DECISION

DALY, District Judge.

Plaintiff Linda Hamilton ("Plaintiff" or "Ms. Hamilton") brings this action against the United States ("the government" or "the defendant") for an alleged wrongful levy. 26 U.S.C. § 7426(a)(1). The case raises an issue of apparent first impression in this Circuit, to wit, whether an executed but unrecorded quitclaim deed purporting to transfer specified real property from the delinquent taxpayer to a third-party defeats the government's levy on that property.

Ms. Hamilton, the third-party in question, seeks to enjoin the government's sale of residential property located at 174–176 Thompson Street, New Haven, Connecticut ("the property"). Ms. Hamilton lives there with her family in a two-family dwelling and claims ownership to it through a quitclaim deed executed in her favor by the record owner, Brenda Jones Agnew ("Ms. Jones"). Ms. Hamilton did not record that quitclaim deed, however, until after the government had seized the property to satisfy Ms. Jones' tax liabilities. Essentially arguing that as a creditor without notice of the prior transaction it is entitled to the protections afforded by Connecticut's recording statute, Conn.Gen.Stat. § 42–10, the government contends that the levy is enforceable.

The matter has been tried to the Court and the parties have supplemented their presentations with post-trial written submissions. This opinion constitutes the Court's findings of fact and conclusions of

law pursuant to Federal Rule of Civil Procedure 52.

## FINDINGS OF FACT

Ms. Hamilton was looking for property to rent when, in 1983, a friend told her about a two-family home on Thompson Street that was available for sale at a relatively inexpensive price. Unemployed at the time, Ms. Hamilton was convinced that she could not obtain a mortgage for the property on her own. Ms. Jones, a long-time friend who owned two other properties and presumably could get a mortgage, offered to acquire the property, in name only, on Ms. Hamilton's behalf. The two women agreed that Ms. Hamilton would pay the closing costs and make the $3,000 down payment on the $30,000 purchase price. Thereafter, Ms. Hamilton would make all mortgage, tax and miscellaneous payments on the property. In exchange, Ms. Jones would execute a quitclaim deed transferring the property to Ms. Hamilton. This plan was chosen in lieu of a co-signing arrangement on the mortgage—with five people already waiting in line at the bank for the property, plaintiff was advised that such a co-signor arrangement would complicate matters and jeopardize any prospects she had of buying the property.

Both Ms. Jones and Ms. Hamilton were present at the November 1, 1983 closing on the property. Also present were Richard Shapiro, Ms. Hamilton's lawyer, and Owen Carber, a representative from New Haven Savings Bank ("the Bank")—both the seller of the property and the mortgagee. As the women had agreed, Ms. Hamilton paid the closing costs and the $3,000 down payment for the property. Mr. Carber executed a quitclaim deed on behalf of the Bank transferring the property to Ms. Jones. Trans. at 10. That deed was recorded with the Registry of Deeds, leaving Ms. Jones the record owner of the property. *See id.* at 83–84. The mortgage deed itself, in the amount of $27,000 in favor of the New Haven Savings Bank, also bore the name of Ms. Jones. Exh. 2.

On the same date as the closing, Ms. Jones executed a quitclaim deed purporting to transfer "all right, title, interest, claim and demand whatsoever" in the subject property to Ms. Hamilton. Exh. 1.[1] Testifying at trial as to her understanding of the quitclaim deed, Ms. Jones stated that if there ever was a question as to who owned the property, the quitclaim deed "would prove that Linda owned it." *Id.* at 23. She later added that "I never owned the property. Only in name only did I own that property. I did not put up any money to [buy] that property.... I was ... doing an honest deed for a friend." *Id.* at 36. The quitclaim deed, notarized and witnessed by Mr. Shapiro, was not delivered to Ms. Hamilton at the closing. Nor was it recorded until June 6, 1989, some two months after the government's seizure of the property and approximately five and one-half years after the closing.[2]

From shortly after the closing until the present, Ms. Hamilton has lived in the prop-

---

1. Ms. Hamilton's uncontradicted testimony at trial established that Ms. Jones signed the quitclaim deed transferring the property to Ms. Hamilton before she signed the quitclaim deed through which the Bank transferred the property to her. Trans. at 84.

2. None of the witnesses at trial, including either Mr. Shapiro, Ms. Jones or Ms. Hamilton, could fully account for the failure to record the quitclaim deed immediately after the closing. It appears that the deed was only mistakenly returned to Mr. Shapiro's file without having been recorded. Although Ms. Hamilton testified that she did not believe it had to be recorded, there is no evidence that she advised Mr. Shapiro not to do so. The deed did not resurface until June, 1989, when Ms. Hamilton, confronted with the seizure of the property, conducted a search for

it. Only then was it recovered from a file at Mr. Shapiro's former law firm.

The government suggested at trial and in its post-trial submission that Ms. Hamilton chose not to record the deed in order to avoid jeopardizing her entitlement to welfare payments. *See, e.g.,* Gov't Post–Trial Brief at 14, 19. The argument, part and parcel of the government's theory of collusion between the two women, is not persuasive. As the Court noted at trial, the theory does not adequately explain Mr. Shapiro's role in the transaction and his testimony that he was under the impression that the quitclaim deed had been recorded. Mr. Shapiro's testimony allows of no inference that he knowingly agreed to keep the deed in his file without recording it.

erty with her children. The first floor of the house has also been periodically leased by her during this period. She has paid all expenses for improvements and repairs to the house as well as the mortgage and tax payments, albeit with the substantial assistance of her mother, her brother and friends. *See* exhs. 7 (New Haven Savings Bank payment book, in name of plaintiff's mother); 10 (payment receipts from New Haven Savings Bank); exh. 14 (various receipts for expenses incurred in improving/repairing the property). Utilities were set up by Ms. Hamilton when she moved into the house and have been paid by her. At least one bill (water/sewage), however, was initially placed under Ms. Jones' name.[3]

Although she helped Ms. Hamilton move in and occasionally assisted with cleaning, Ms. Jones never made any payments in connection with the property, never lived there, never rented there, never stayed there and never made any improvements or repairs to it. However, she did list 174 Thompson Street as a source of $600 in rental income on her 1987 tax return. Exh. 502. Ms. Jones also cited the following rental expenses relating to the property on the same return: $1,313 in insurance, $2,894 in mortgage interest payments, $1,510 in repairs, $1,573 in taxes, $2,000 in utilities and $1,400 in depreciation expenses. The property was similarly listed in Ms. Jones' 1988 return, filed jointly with her husband. Exh. 505. That return listed $500 in rental income on the property and $7,983 in rental expenses, including depreciation. *Id.* Ms. Jones explained at trial that she and Ms. Hamilton were friends and that Ms. Hamilton had no objections to her "reaping the gain" from the property.

Trans. at 41. Asked whether Ms. Hamilton knew about her representations on the tax returns, Ms. Jones replied simply "[w]hy not?" *Id.* Ms. Hamilton's testimony on this point was not nearly as clear. Asked whether she knew that Ms. Jones was "doing things on her return related to that home," Ms. Hamilton responded as follows: "I knew that she used the tax—I really don't know. I should not say anything, because I really do not fully understand all the terms. But I did know that [ ] something with the interest rate or something interest that you can deduct from your taxes." *Id.* at 100. She also testified that Ms. Jones had mentioned something to her about taking the interest deduction "the first year that I purchased the house" but that she could not recall any later such references. Asked whether she had voiced any concerns to Ms. Jones regarding such an interest deduction, Ms. Hamilton responded that she had not. *Id.*[4]

On April 11, 1989, the defendant, through IRS Collection Officer Alice Hammermann ("Officer Hammermann"), seized the subject property in order to satisfy Ms. Jones' unpaid tax liabilities. The seizure followed a property search by Officer Hammermann at the New Haven Town Hall, a review of Ms. Jones' 1987 tax return, an interview with Ms. Jones[5] and a check with the New Haven Tax Assessor's office, all of which indicated that Ms. Jones was the record owner of the property. Officer Hammermann also wrote a letter to the Southern Connecticut Water Authority to determine if there was any back money owed to the utility. The Water Authority's response also indicated that Ms. Jones was the owner of the property.

3. The government's proposed finding of fact that all other utilities, including electricity, were held and paid in the name of Brenda Jones, finds no support in the record. *See* Gov't Post–Trial Brief at ¶ 11.

4. The record does not support the government's claim that Ms. Jones reported ownership of the property "[o]n her tax returns for tax years 1983 through 1988." Gov't Post–Trial Brief at ¶ 14. Only Ms. Jones' 1987 and 1988 returns were admitted at trial; the sole reference to returns from 1983 through 1986 came in the form of a

question from government counsel that was not subsequently adopted by the witness. *See* Trans. at 31–32. Alleged exhibits 503 and 506, cited by the government in connection with this argument, *see* Gov't Post–Trial Brief at ¶ 15, are not part of the record in this case.

5. When Officer Hammermann met with Ms. Jones to secure a financial statement, Ms. Jones indicated to her that she owned the Thompson Street property. Trans. at 130 (Officer Hammermann's testimony).

On April 12, 1989, immediately after learning of the seizure, Ms. Hamilton telephoned Officer Hammermann and told her that she had a quitclaim deed that would establish that she, Ms. Hamilton, was the owner of the property. Officer Hammermann replied that no such deed had ever been recorded and that if Ms. Hamilton had such a document, she would like to see it. After a successful search for the unrecorded quitclaim deed, *see supra* note 2, Ms. Hamilton's lawyer, V. James Ferraro, sent Officer Hammermann a copy of the deed along with a letter advising her that he was having the deed recorded with the New Haven Land Records Office. Exh. 5 (June 5, 1989 dated letter from V. James Ferraro to Alice Hammerman[n]). The letter also requested that the government "release the property at 174–176 Thompson Street, New Haven from the IRS seizure, since Brenda Jones is not the owner of the property. The true owner is Linda Hamilton." *Id.* Notwithstanding Ms. Hamilton's claimed rights to the property, the IRS declined to release the levy. On March 13, 1990, Officer Hammermann orally notified Ms. Hamilton that the IRS intended to advertise immediately and sell the property in order to satisfy Ms. Jones' liabilities. This suit was commenced two days later.

## CONCLUSIONS OF LAW

Plaintiff brings this action pursuant to 26 U.S.C. § 7426(a)(1). That statutory section provides for suits by third-parties seeking recovery of property in which they claim an "interest," property allegedly "wrongfully" levied by the Internal Revenue Service ("IRS") in its efforts to collect taxes owing from a delinquent taxpayer.[6] A levy of property is "wrongful" if made "upon property in which the taxpayer had no interest at the time the lien arose or thereafter." 26 C.F.R. 301.7426–1 (1991); *see also* S.Rep. No. 1708, 89th Cong., 2d Sess. 30 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3722, 3751 (" '[w]rongful,' as

used here, refers to a proceeding against property which is not the taxpayer's"); *Arth v. United States,* 735 F.2d 1190, 1193 (9th Cir.1984) ("[p]roperty is wrongfully levied if it does not, in whole, or in part, belong to the taxpayer against whom the levy originated") (citations omitted).

The burden of proof in a § 7426 proceeding rests on the plaintiff, in the first instance, to show that she has title or some other ownership interest in the property and that the government made a levy on that property because of a tax assessment against another taxpayer. *Morris v. United States,* 813 F.2d 343, 345 (11th Cir. 1987). The burden is essentially that of establishing standing. Assuming the plaintiff proves standing, the burden then shifts to the government to prove a nexus between the property and the delinquent taxpayer. *Id.* The ultimate burden remains the plaintiff's—that of showing that the levy was wrongful, *i.e.,* that the property did not belong to the taxpayer against whom the levy was directed but, in fact, belonged to the plaintiff. *Security Counselors, Inc. v. United States,* 860 F.2d 867, 869 (8th Cir.1988); *Arth,* 735 F.2d at 1193.

As Ms. Hamilton is in possession of the property and as the record clearly indicates that the government made a levy on that property because of a tax assessment against another taxpayer, Ms. Hamilton has satisfied her initial standing burden. *Marotta v. United States,* 82–1 U.S. Tax Cas. (CCH) (N.D.N.Y. March 6, 1981) (MacMahon, J.) ("generally, courts have held possession a sufficient interest to meet the standing requirement of Section 7426") (citations omitted); *compare Rabinof v. United States,* 329 F.Supp. 830, 843 (S.D.N.Y.1971) (plaintiffs in action to enjoin enforcement of tax levy on valuable violin and bows had standing to sue under § 7426 where plaintiffs had possession of the subject property) *with Valley Finance, Inc. v. United States,* 629 F.2d 162, 168 (D.C.Cir.

---

**6.** Recognizing that the government's rigorous tax enforcement activities at times encroach upon persons other than the delinquent taxpayer, Congress sought through this provision to provide a measure of protection for the proper-

ty rights of these third-parties. *See Falcon Constr. Co. v. United States,* No. F–87–332 (EDP), 1988 U.S.Dist.LEXIS 16730, at *9 (E.D.Cal. June 15, 1988) (citing the section's legislative history).

1980), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981) (held that general creditors without a security interest in the property seized or some other "specific possessory right" did not have standing to sue under § 7426). Defendant's arguments to the contrary are not persuasive.

■ The government first argues that as Ms. Jones executed the quitclaim deed on Ms. Hamilton's behalf before the Bank had even transferred the property to her, *see supra* note 1, she "had no rights in the Thompson Street property to quitclaim to the plaintiff at the time she executed the quitclaim deed." Gov't Post–Trial Brief at 6. As such, it submits, plaintiff acquired no legal interest in the property via the quitclaim deed. Defendant offers no legal support, however, for what the Court finds, in any event, a tenuous argument. It is sufficient, in the Court's view, that the two documents were part of the same transaction and that the execution of one was substantially contemporaneous to the execution of the other. *See World Inv. Co. v. Kolburt,* 317 S.W.2d 697, 701 (St. Louis Ct. of Appeals 1958) ("[t]he true test is whether [the instruments] were executed as integral acts in a series of acts which, taken together, constitute one continuous transaction, and were so intended, so that in order to carry out the intention of the parties the two instruments should be given contemporaneous operation and effect"); *cf. Ethridge v. Allied Equip. & Supply Co.,* 26 N.J.Super. 586, 587–88, 98 A.2d 590, 591 (1953) ("where, as in this matter, there is no intention to evade the statute and the parties contemplate the prompt execution and delivery of the prescribed title papers, the transaction should not be considered void merely because the papers were not delivered at the moment the bargain was struck or when the buyer took possession of the vehicle").

■ Defendant next argues that even assuming Ms. Jones had an interest in the property at the time she executed the quitclaim deed, there was no valid conveyance of the interest in the absence of actual delivery of the quitclaim deed to plaintiff. In making this argument, defendant assumes the burden of proving by clear and convincing evidence that there was no valid delivery. *Lomartira v. Lomartira,* 159 Conn. 558, 562, 271 A.2d 91, 93 (1970). It is well settled that "[t]he delivery of a deed with intent by the grantor to pass title is essential to a valid conveyance." *City Nat'l Bank v. Morrissey,* 97 Conn. 480, 483, 117 A. 493, 494 (1922). It is not necessary, however, that the instrument be delivered to the grantee in person; delivery to an authorized agent of the grantee is as effective as though made to the grantee herself. 23 Am.Jur.2d, *Deeds* §§ 138–39. In all cases, the "intent of the grantor is ... the most important factor." *D'Addario v. D'Addario,* No. 256879S, 1991 WL 84002, at * 6, 1991 Conn.Super. LEXIS 891, at *14 (April 24, 1991); *see generally* 23 Am.Jur.2d, *Deeds* § 123.

■ The evidence adduced at trial indicates that Ms. Jones' intent in executing the quitclaim deed was that of effecting a transfer of the property to the plaintiff. As Ms. Jones testified at trial, "it was explained to both [myself and Ms. Hamilton at the closing] that I did not own the property. This quit-claim deed meant that it would stay in the file and if it ever came a time of question [of] who owned the house, this would prove that Linda owned it." Trans. at 23. Equally evident at trial was the fact that Ms. Hamilton intended Mr. Shapiro to act as her agent in accepting delivery of the quitclaim deed. Evidence the following exchange between Ms. Hamilton and counsel for the government:

Q—So your understanding was that the deed was in the attorney's office and that protected you as the owner of the property?

A—Yes, yes....

Q—Do you know why it wasn't recorded? Do you know why it wasn't recorded?

A—I fe[lt] there wasn't a need to. I just felt it was safe, you know. I thought it was legal just the way it was. Completely legal.

Q—You mean to have it in the attorney's possession?

**332**

A—Yes.

*Id.* at 60.

Under all the circumstances and particularly in view of the foregoing, the Court finds that Ms. Jones intended to pass title to Ms. Hamilton via the quitclaim deed and that delivery of that deed to her was constructively made through Mr. Shapiro. The government's claim to the contrary is without merit.

■ Having concluded that Ms. Hamilton has standing to bring this action, the Court's focus turns to whether the government has established the condition precedent to the government seizure, namely, that a nexus exists between Ms. Jones, the taxpayer, and the property. *See* 26 U.S.C. § 6321 (affording the government a lien for delinquent taxes upon "all property and rights to property" belonging to the taxpayer). In determining the nature of the legal interest Ms. Jones had in the subject property at the time of the seizure, the Court must look to Connecticut law. *Aquilino v. United States,* 363 U.S. 509, 513, 80 S.Ct. 1277, 1280, 4 L.Ed.2d 1365 (1960). Whether or not any state-created interest she had in the property can then be said to constitute possession of the "property or rights to property" to which a tax lien can attach under § 6321, is a question of federal law. *United States v. National Bank of Commerce,* 472 U.S. 713, 727, 105 S.Ct. 2919, 2927, 86 L.Ed.2d 565 (1985) ("[t]he question whether a state-law right constitutes 'property' or 'rights to property' is a matter of federal law") (citation omitted); *Kimura v. Battley,* 969 F.2d 806, 810 (9th Cir.1992) ("[o]ur initial task is to understand and define the bundle of rights and privileges that Alaska law has created in favor of the holder of a liquor license. Concomitant with our state law inquiry, we must determine as a matter of federal law whether the interest created by the statute is 'property' or a 'right to property' to which the federal tax lien can attach") (citations omitted); *Terwilliger's Catering*

*Plus, Inc. v. United States,* 911 F.2d 1168, 1171 (6th Cir.1990), *cert. denied sub nom. Ohio Dep't of Taxation v. IRS,* — U.S. —, 111 S.Ct. 2815, 115 L.Ed.2d 987 (1991) (same). An interest is said to constitute possession of the "property or rights to property" where that interest is "an economic asset in the sense that it has pecuniary worth and is transferable." *Little v. United States,* 704 F.2d 1100, 1106 (9th Cir.1983); *see also Kimura, supra* ("a liquor license will constitute property, within the meaning of federal law, if the license has beneficial value for its holder and is sufficiently transferable") (citing *Little* ); *21 West Lancaster Corp. v. Main Line Restaurant, Inc.,* 790 F.2d 354, 357 (3d Cir.1986) (same).

■ In asserting that Ms. Jones had an economic asset in the property and thus rights to it, the government relies on Connecticut General Statute § 47–10, providing that "[n]o conveyance shall be effectual to hold any land against any other person but the grantor and his [or her] heirs, *unless recorded on the records of the town in which the land lies."* Conn.Gen.Stat. § 47–10 (emphasis added). Applying that provision to the circumstances present in the case at bar, the government submits that Ms. Hamilton's failure to record the duly executed quitclaim deed allowed Ms. Jones to retain marketable title to the property. She could pass that title to a bona fide purchaser for value who could record first and whose claim would then be superior to Ms. Hamilton's. Gov't Post–Trial Brief at 17. This is true despite the fact that as between Ms. Jones and the first purchaser, Ms. Hamilton, the quitclaim deed is valid and binding.[7] According to the government's analysis, the power to make this second sale amounts to an economic asset belonging to Ms. Jones. That alleged asset, in turn, would constitute a right to the property cognizable under § 6321. *See Little, supra.*

7. Connecticut law provides that a quitclaim deed, when duly executed, "has the force and effect of a conveyance to the releasee of all the releasor's right, title and interest in and to the property described therein...." Conn.Gen.Stat.

§ 47–36f. Thus, as between Ms. Jones and the plaintiff, the deed is valid, though not recorded, and in a contest between the two, Ms. Jones could successfully claim no interest in the property.

The Court finds the government's argument troubling. The position, akin to that taken by the government in *United States v. V & E Engineering & Construction Company,* would have this Court effectively sanction the knowing sale by a vendor of the same piece of property to two purchasers. 819 F.2d 331, 333 (1st Cir.1987). In *V & E,* the First Circuit concluded that the Puerto Rico recording statute at issue, a race-notice statute, could not be presumed to work such a result.[8] As the Court explained:

> [t]he government's argument amounts to asking that we construe the term "right to property" in section 6321 as referring to the possibility that the seller might fraudulently convey the sold property to an innocent third party. We cannot accept that Congress intended the term "right" to include the possibility that a party might engage in fraud. Under the Puerto Rico statutory scheme, a taxpayer, once having sold his property, no longer has a "right" to that property within the meaning of section 6321.

*Id.* In so concluding, the First Circuit relied, *inter alia,* on a Puerto Rico statutory provision specifying that "a sale shall be perfected between vendor and vendee and shall be binding on both of them, if they have agreed upon the thing which is the object of the contract and upon the price, even when neither has been delivered." P.R. Laws Ann. tit. 31 § 3746. Under that provision, noted the Court, "a vendor is bound by the sale of his property, regardless of the recording of that sale by the purchaser. He, therefore, has no 'right to property' under 26 U.S.C. § 6321." 819 F.2d at 334.

Connecticut law regarding quitclaim deeds includes a comparable provision, Conn.Gen.Stat. § 47–36f (quoted above in note 7). Following the First Circuit's reasoning in *V & E,* Ms. Jones relinquished any *valid* right to make further transfer of the property in question when she executed the quitclaim deed transferring the property to Ms. Hamilton.[9] It is undoubtedly true that where, as here, the first grantee failed to record, any subsequent grantee of the property from Ms. Jones who does record would prevail in a contest with the first grantee. Nonetheless, the second transfer would have worked a fraud on the first transferee, here Ms. Hamilton. The Court is hard pressed to believe Congress would countenance this result. As there can be no valid right to sell the same property twice and as Conn.Gen.Stat. § 47–36f had the operative effect of divesting Ms. Jones of title to the property when the quitclaim deed was executed, her conceded ability to sell the property twice could only be wrongful and cannot be characterized as the kind of economic asset said to constitute a property interest under § 6321. *See V & E, supra.* The Court notes that had the Connecticut legislature enacted a provision outlawing the sale of real property one does not own, the government could not have made this argument. Ms. Hamilton should not be penalized merely because the precept is so obvious as to be virtually above legislating.

To the extent the *United States v. Creamer Indus., Inc.* and *Prewitt v. United States* cases in the Fifth Circuit compel a different result, the Court declines to follow them. As the First Circuit intimated in *V & E,* the persuasive dissent by the Honorable John R. Brown in *Creamer* and the concurrence by the Honorable E. Grady Jolly in *Prewitt* leave those decisions less than compelling authorities. *Creamer* involved the case of a delinquent taxpayer who had sold several tracts of land to a bona fide purchaser. 349 F.2d 625 (5th Cir.), *cert. denied,* 382 U.S. 957, 86 S.Ct. 434, 15 L.Ed.2d 361 (1965). The deed subsequently recorded by the purchaser erroneously failed to include certain tracts of the land. The deed was later corrected to

---

**8.** As here, *V & E* involved a situation where notice of an IRS tax lien was filed before the mortgage and deed of sale from an earlier transfer of the property by the delinquent taxpayer, V & E, were recorded. The government argued that the property remained subject to the tax lien even after V & E had sold the property to innocent third-parties.

**9.** The government's attempts to distinguish *V & E* are unpersuasive. *See* Gov't Post–Trial Brief at 15 n. 2.

include the omitted property but only after a federal tax lien against the taxpayer had attached to that portion of the property. Over a vigorous dissent by Judge Brown, the majority held the lien enforceable, reasoning that the conveyance of the omitted property had not been timely recorded and that the IRS was therefore a creditor without notice and entitled to the protection of the applicable recording statute. Judge Brown made the following cogent argument in dissent: "the morality of the Government's taking property which the Court's opinion reflects was sold to, paid for by, and in equitable conscience and law belonged to a stranger, is so disturbing to me that before the heavy hand of the tax gatherer falls, it is for Congress to speak clearly to declare that this is the conscience of the country." *Id.* at 629–30 (Brown, J., dissenting); *see generally Travis v. United States*, No. 385991, 1989 WL 362665, at * 2, 1989 U.S.Dist.LEXIS 12047, at *5 (E.D.Tenn. Sept. 27, 1989) (wherein the district court noted that Judge Brown's dissent had been "at the heart of" its ruling in favor of plaintiffs who had brought a similar claim).

*Prewitt* involved the filing of notice of a tax lien against real property previously owned by James and Johanna Damon. 792 F.2d 1353 (5th Cir.1986). The notice named James Damon only. Before the notice was filed, however, Mrs. Damon had been awarded the whole of the property pursuant to a divorce decree and had subsequently sold it to Mr. Prewitt, a third-party without notice. Ms. Damon had not filed a copy of the divorce decree until after the filing of the levy notice at issue. Although conceding that on the date the lien notice was filed "James had no enforceable interest in the property as against Johanna, the divorce decree which awarded her the property having become final two months before," the Fifth Circuit reached the seemingly reluctant conclusion that it was bound by precedent to hold the lien enforceable. 792 F.2d at 1355 (noting that

"[w]hile on its face somewhat appealing, [Mr. Prewitt's] argument is foreclosed by *United States v. Creamer Industries, Inc.*"). Concurring in the majority opinion, the Honorable E. Grady Jolly explained that he fully agreed with Judge Brown's dissent in *Creamer* and was joining the majority "only because we are bound by our own precedent," namely *Creamer. Id.* at 1359 (Jolly, J., concurring). Judge Jolly then proceeded to criticize the illogical result dictated by *Creamer:*

Here, pursuant to the divorce decree, the property was transferred from the taxpayer to his wife in a final judgment on October 9, 1982. From that point forward, the taxpayer had no interest or right whatsoever, legal or equitable, in this property.... Whatever the [subsequent] lien attached to, it did not attach to this property because it in no way, shape or form belonged to the taxpayer.

*Id.*

Neither the *Creamer* decision nor the *Prewitt* decision persuades the Court that the government's position here is a sound one. Neither case is on all fours with the one at bar, neither is binding on this Court and neither is overly persuasive, particularly when read in conjunction with Judge Brown's and Judge Jolly's respective opinions.

More persuasive, at least at first blush, is the government's argument that Ms. Jones also had a "right to the property" to the extent that she derived economic benefit from the purported ownership of it by taking related deductions on her 1987 and 1988 tax returns. However, while evident that her purported ownership of the property in that context held pecuniary worth for Ms. Jones, that interest was not transferable. *See Little*, 704 F.2d at 1106. As discussed above, although she could actually have sold the property twice, thereby transferring the tax advantages accompanying it, the Court will not allow that she could have done so legitimately.[10] Plaintiff

10. The government's additional claim, that "Ms. Jones was further able to list the parcel on any and all loan and other credit applications she may have chosen to make," has no evidentiary

basis in the record and was presumably offered as hypothetical support for the government's position. *See* Gov't Post–Trial Brief at 10. This hypothetical interest, while also of obvious pe-

has one additional source of pecuniary worth in the property arising out of the protections extended lien creditors under the Connecticut recording statute. *Prudent Projects v. Travelers Ins. Co.*, 3 Conn. App. 429, 431 n. 3, 489 A.2d 396, 397 n. 3 (1985). The government not having raised this argument, the Court will not address it.

The Court holds that the foregoing rationale defeats any claimed nexus between Ms. Jones and the property in question.[11] In so holding, the Court has not ignored the fact that the IRS stands before it as a creditor who put a lien on the property without notice that, in fact, the property belonged to Ms. Hamilton. There is no evidence that before Officer Hammermann seized the property on April 11, 1989 she knew that Ms. Hamilton had been living there and had been making all payments relating to the property, albeit with the substantial assistance of family and friends. Nonetheless, the Court's decision finds additional support in a distinction between this creditor and other persons or entities seeking protection under Connecticut's recording statute. While courts in Connecticut have extended the protections of the recording statute to creditors, *see Prudent Projects*, 3 Conn.App. at 431 n. 3, 489 A.2d at 397 n. 3, it is apparent that the courts had in mind those individuals or entities that had actually extended credit to the record owner in reliance on the land records. *See Second Nat'l Bank of New Haven v. Dyer*, 121 Conn. 263, 184 A. 386 (1936) ("we have gone beyond the express terms of the recording statute and ... have given the protection of the recording system to those who have given credit to one appearing upon the record to be the owner of the property although he had no beneficial right in it") (citations omitted). Defendant here is not so situated. The record is devoid of any evidence that the government ever extended credit to Ms. Jones in reliance on her record ownership of the subject property. The case does not, in sum, involve the equitable stakes typically dispositive of the conventional recording statute dispute. It calls to mind instead Judge Brown's words in dissent in *Creamer*:

> This is a startling result. Laws of Texas which are designed to protect innocent persons dealing in faith on the revelations of title records are twisted to permit the great national sovereign to take property from one who is the acknowledged owner of it to apply on the tax debts of another the former owner who—as the trial Court found and this Court does not dispute—has transferred the property. I do not believe that Congress ever intended any such result. I do not think that a Court should lend its hand to anything so demeaning to a sovereign.

349 F.2d at 629 (Brown, J., dissenting) (footnotes omitted).

▮ The government offers the alternative argument that Ms. Hamilton should be estopped, as an equitable matter, from denying Ms. Jones' alleged interest in the

---

cuniary value, is only as transferable, however, as the property itself. As noted above, the property itself cannot properly be transferred.

11. The Second Circuit's recent decision in *SEC v. Levine*, reversing a District Court's holding that assets obtained by wrongful means could not properly be considered property of the taxpayer for § 6321 purposes, does not compel this Court to reach a contrary finding. 881 F.2d 1165 (2d Cir.1989), *aff'g in part, rev'g in part* 689 F.Supp. 317 (S.D.N.Y.1988). The Second Circuit reversed the District Court's conclusion on two grounds. As an initial matter, the Court found no evidence to support the finding below that the assets had been obtained by wrongful means. Assuming, *arguendo*, that that finding was supportable, the Court found error in the District Court's ensuing legal analysis and, specifically, its conclusion that the applicable provision of the Securities Exchange Act of 1934 would have rendered the wrongful transaction at issue void. Because the statutory provision at issue only rendered the transaction voidable and not void, and because New York law provides that a culpable party to a voidable transaction nonetheless acquires title, albeit voidable title, to the transferred goods, the Court concluded that defendants had acquired property rights in the goods and that the contrary finding below was in error. *Id.* at 1176.

Unlike *Levine*, this case does not involve a contract voidable under federal law, nor does it involve any state law providing that a voidable transaction nonetheless extends good title to the property at issue.

property. The Court finds this argument unavailing, premised as it is on the government's unsupported collusion theory. As noted earlier, *see supra* note 2, the Court is not convinced that either woman made a deliberate decision not to record the quit-claim deed with a wrongful purpose in mind. For example, plaintiff did not testify, as the government alleges, that "she would not have wanted to be named as titular owner at the time Brenda Jones purchased the property since her one stable source of income was welfare." Gov't Post-Trial Brief at 18. Although Ms. Hamilton testified that she did not inform the State Department of Income Maintenance that she had purchased a home, *see* Trans. at 103, the government's above paraphrase strikes the Court as a reaching extrapolation of that testimony.[12]

## CONCLUSION

In the absence of a finding that Ms. Jones possessed the property at issue or rights to it, the Court concludes that the challenged levy was wrongful. So concluding, the Court hereby ORDERS the Clerk of the Court to enter judgment for the plaintiff. Consistent with this Order, the Commissioner of the Internal Revenue Service is directed to cause the release of the lien at issue forthwith.[13]

SO ORDERED.

---

12. In view of the findings above, the Court need not address plaintiff's alternative argument that Ms. Jones held the record title under the resulting trust doctrine as trustee for the benefit of Ms. Hamilton.

13. As the mortgage on the property has not been repaid in full, the Court declines to grant the relief requested in paragraph 2 of plaintiff's prayer for relief—the issuance of a declaration that she is the sole and absolute owner of the subject property.