In re The CAROLINCH COMPANY, Debtor.

Katharina PALNIK, Plaintiff,

v.

UNITED STATES of America, Defendant.

Bankruptcy No. 96–11200DAS.
Adversary No. 97–0228DAS.

United States Bankruptcy Court,
E.D. Pennsylvania.

July 15, 1997.

Brendan J. Sherman, Ciardi, Maschmeyer & Karalis, Philadelphia, PA, for Debtor.

Nicholas J. Scafidi, Philadelphia, PA, for Plaintiff.

Thomas M. Rath, Philadelphia, PA, for Internal Revenue Service.

Gregory S. Hrebiniak, U.S. Dept. of Justice, Washington, DC, for Internal Revenue Service.

### MEMORANDUM

DAVID A. SCHOLL, Chief Judge.

THE CAROLINCH COMPANY ("the Debtor"), formerly a manufacturer of electroplating, filed a voluntary petition under Chapter 11 of the Bankruptcy Code on February 13, 1996. The Debtor remained in Chapter 11 for almost a year in attempting to reorganize in a manner that it could remain in business. However, prior to confirmation, it determined that these efforts to continue its business would be fruitless. The Debtor's Second Modified Plan, ultimately confirmed on February 18, 1997, contemplated an orderly liquidation of the Debtor's assets. On March 8, 1997, an auction was held in which all of the Debtor's assets were sold, the proceeds of which total $207,485.68 and remain in an escrow account pending a determination by this court of the priority of the two competing secured creditors, the parties to the instant proceeding ("the Proceeding"), KATHARINA PALNIK ("the Plaintiff") and the UNITED STATES OF AMERICA through its agency, the Internal Revenue Service ("the IRS").

According to the Stipulation of Facts, which constitutes most of the record, the Plaintiff is a secured creditor of the Debtor with a proof of claim in the amount of approximately $600,000.00. This claim is the result of four separate loan agreements which the Debtor entered into with Bucks County Bank & Trust Company ("BC Bank"). These loans were in the respective amounts of $300,000.00 and $250,000.00, dated September 22, 1989; $550,000.00, dated December 4, 1991; and $100,000.00, dated April 14, 1992.

The purpose of these loans was to provide the Debtor with operating capital, and the loans were secured by certain agreements whereby the Debtor granted to BC Bank a security interest in and a continuing lien upon basically all of its assets, including the proceeds of any sales of such items which were then owned or thereafter acquired by the Debtor.

The duly-perfected security interests of BC Bank became the property of CoreStates Bank, N.A. ("CoreStates"), as the BC Bank's successor by merger. Subsequently, on April 29, 1986, the Plaintiff entered into an agreement whereby all of CoreStates' rights in the collateral were assigned to the Plaintiff.

The Plaintiff is the mother of Robert Palnik ("Robert"), the president of the Debtor, which was at all times a family-owned business. In her brief testimony, the Plaintiff testified that her reason for purchasing CoreStates' interest in the Debtor was that she believed that, if CoreStates were no longer involved with the Debtor, it would be able to continue doing business. This intended purpose was, of course, to be frustrated.

Prior to the Debtor's bankruptcy petition, the IRS filed several notices of federal tax liens against the Debtor. Said liens were filed on June 27, 1991; March 31, 1992; March 30, 1993; October 18, 1993; October 14, 1994; and August 2, 1995. The secured claim held by the IRS is in the total amount of $271,675.15, and it arises from the Debtor's nonpayment of certain withholding taxes.

As it developed, the pivotal testimony at trial was adduced from Robert, who stated that only a small fraction of the assets which were sold in the liquidation sale were purchased on or after June 27, 1991, when the initial federal tax lien was filed. He further testified that the value of the items purchased on or after June 27, 1991, totaled approximately $12,000, with a range of error of no more than twenty (20%) percent. When asked how he was able to determine those which were purchased on or after June 27, 1991, from the list of assets sold, Robert responded that very few items had been purchased after that date, specifically only two computers and various small hand tools, because the work in which the Debtor was engaged from 1991 through the cessation of the Debtor's operations did not require any substantial purchases of equipment or other assets.

In their briefs, the parties both emphasize their agreement that 26 U.S.C. §§ 6321 to 6323, interpreted by *United States v. McDermott,* 507 U.S. 447, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993), control the disposition of the Proceeding. Pursuant to 26 U.S.C. § 6321,

> if any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal belonging to such person.

The parties do not dispute that the IRS has valid tax liens totaling $271,675.15 against the Debtor.

█ It cannot be disputed that the scope of the federal tax lien is broad. *See, e.g., United States v. National Bank of Commerce,* 472 U.S. 713, 719–20, 105 S.Ct. 2919, 2923–24, 86 L.Ed.2d 565 (1985); and *In re Blackerby,* 208 B.R. 136, 140–41 (Bankr. E.D.Pa.1997). However, the parties further agree that the concept of "the first in time is the first in right" applies and dictates that those liens which are filed first receive priority in being paid. *See McDermott, supra,* 507 U.S. at 449, 113 S.Ct. at 1527–28. Additionally, 26 U.S.C. § 6323(a) provides that "a federal tax lien shall not be valid . . . against any holder of a security interest . . . until notice thereof . . . has been filed." Thus, a federal tax lien normally does not exist until notice thereof has been filed in accordance with § 6323(f).

█ According to the Stipulation of Facts, the first two of the Debtor's four loans and promissory notes were executed on September 22, 1989, while notice of the first federal tax lien was not filed until June 27, 1991. Thus, on the basis of both common law principles and statutory law, the Plaintiff's first two liens have priority over all of the IRS's subsequent claims and these two liens easily exceed the total amount of the sale proceeds. However, the parties also agree that *McDermott* holds that, nevertheless, a non-governmental creditor's lien is prior to that of the IRS only as to property which the taxpayer acquired prior to the imposition of the IRS's lien. 507 U.S. at 452–54, 113 S.Ct. at 1529–31.

Applying these principles to the instant facts, the parties do not dispute that the IRS has priority, and is entitled to the sale proceeds, only to the extent of the value of secured property which the Debtor acquired after the IRS filed its initial tax lien notice on June 27, 1991. Thus, the parties have agreed, and we concur, that the Plaintiff's liens are valid against all liened property of the Debtor purchased prior to June 27, 1991.

The IRS asserts that it is entitled to at least $14,000.00, based upon its recollection of the testimony given by Robert. More specifically, the IRS contends that, because Robert estimated his margin of error to be twenty (20%) percent, the value of the post-June 27, 1991 assets could be a high as $40,000.00. The Plaintiff, meanwhile, contends that Robert testified that the proceeds from assets purchased on or after June 27, 1991, "total roughly $12,000.00." The Plaintiff observes that, even with a margin of error of twenty (20%) percent, this testimony would entitled the IRS to, at most, $14,-400.00.

After carefully reviewing the tape of Robert's June 11, 1997, hearing testimony, we agree with the Plaintiff that Robert did, in fact, testify that the value of the Debtor's collateralized assets purchased after June 27, 1991, was estimated at $12,000.00. With respect to the IRS's contention that it is entitled to an amount ranging from $14,000.00 to $40,000.00, we are unsure of how it could have ever arrived at the latter amount. Perhaps its contention reflects computation of twenty (20%) percent of the amount of the $207,485.68 proceeds from the liquidation sale. However, any such calculation would clearly be mathematically erroneous, as Robert made no reference to the proceeds of the asset sale in rendering his estimate.

Further, it ignores the fact that the twenty (20%) percent margin of error could work in either direction. Thus, applying the $12,-000.00 estimate of Robert, which is the only pertinent evidence of record, we deduce that the IRS could be entitled to a priority for a figure anywhere from a low of $9,600.00 to a maximum of $14,400.

We conclude that the IRS is entitled to $13,000.00 from the proceeds. Initially, we note that the testimony of Robert was unrebutted and unshaken by cross-examination. His valuation seems reasonable in light of his logical testimony that only two computers and various small and tools were purchased on or after June 27, 1991, because the jobs done by the Debtor from 1991 through the time when the Debtor ceased operations did not appear to require any large purchases. When asked to identify the purchase dates of randomly selected collaterized items upon cross-examination, Robert was easily and credibly able to do so.

We nevertheless are inclined to render our decision on the high side of Robert's estimate in favor of the IRS, because we believe that Robert was naturally inclined to estimate the value of assets purchased on or after June 27, 1991, on the low side, in order to benefit his mother. On the other hand, we cannot stray far beyond the figure which Robert quoted because we assume that the IRS would have produced evidence to the contrary if he had been too far off the mark. Thus, we are unwilling to value the IRS's entitlement at an amount in excess of $13,-000.00.