**Dennis C. BURRILL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 97–328–CIV–T–17.**

United States District Court,
M.D. Florida,
Tampa Division.

April 13, 1998.

G. Barry Wilkinson, Lefter, Cushman, Wilkinson & Sadorf, P.A., St. Petersburg, FL, for plaintiffs.

Charles ·R. Wilson, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Philip Doyle, U.S. Dept. of Justice, Tax Div., Washington, DC, for defendants.

### ORDER ON MOTION FOR SUMMARY JUDGMENT

KOVACHEVICH, District Judge.

The cause is before the Court on plaintiff's motion for summary judgment, with memorandum in support thereof (Docket No. 33), and response thereto (Docket Nos. 35–36).

### BACKGROUND

This case commenced with the filing of a complaint, which was followed by the filing of an amended complaint (Docket No. 24). The amended complaint contains the following causes of action: Count I-petition to ·quiet title and Count II-damages for failure to timely release federal tax liens. Upon answering the amended complaint, the defen-

dant filed a counterclaim to foreclose federal tax liens on certain real property owned or previously owned by Villy P. Laursen, asserting that the purported transfer of Unit 1003 from Laursen to Dennis P. Burrill, the plaintiff/counter-defendant herein, was a sham and a fraud.

## FACTS

The following facts are submitted by the parties, in support and/or in opposition to, the motion for summary judgment. The Court recognizes these as "facts" only in regard to resolution of the pending motion.

1. Plaintiff filed an action in state court seeking to quiet title to real property known specifically as Unit 1003 (the Unit), as shown on the Condominium Plat of Madeira Towers, located in Pinellas County, Florida. The case was removed to this Court by the defendant.

2. The specific property in question is as described in the deeds in the name of Dennis C. Burrill, mortgagor, (Exhibit to the Amended Complaint (Ex.) B):

> That certain parcel consisting of Unit 1003 as shown on Condominium plat of MADEIRA TOWERS, a condominium, according to Condominium Plat Book 31, Pages 38 through 39, Public Records of Pinellas County, Florida and being further described in that certain Declaration of Condominium filed in Official Records Book 4773, Pages 1478 through 1554, inclusive, Public Records of Pinellas County, Florida; together with the exhibits attached thereto and made a part thereof; and together with an undivided share in the common elements appurtenant thereto.

3. The plaintiff originally purchased the Unit from Arthur R. Rowe and Gregg S. Rowe, as joint tenants with rights of survivorship, on or about September 16, 1980, for a purchase price of $115,000.00, with no down payment. (Deposition of Dennis Burrill 1997 (Depo.I), pg. 8). The deed from this transaction was properly recorded (Response to Motion for Summary Judgment).

4. The mortgage was for a five year term, with the plaintiff only paying interest each month, in the amount of $1,150.00. At the end of the five years there was a balloon note which would have to be paid in full. The plaintiff only lived in the condominium for six or eight months before he purchased a second condominium. After he moved out, he rented the Unit (Depo.I, pgs.9–10).

5. The plaintiff and Villy Laursen met at chiropractic college and they developed a friendship in the late 1960's or early 1970's, when the plaintiff had a practice in St. Petersburg and Dr. Laursen had a practice in Tampa. (Depo.I, pgs.12–14). At one time, the plaintiff was the executor of Dr. Laursen's estate; a beneficiary of his will; and he was named on some of Dr. Laursen's bank accounts, including account in the Bahamas. At the time of the plaintiff's 1997 deposition, Dr. Laursen's whereabouts were unknown (Depo.I, pgs.17–19).

6. On September 1, 1983, the plaintiff signed a warranty deed for the Unit naming Villy P. Laursen, a single man, as the grantee. The deed was notarized. The deed states it is made in consideration of the sum of "Ten ($10.00) and other good and valuable consideration (Ex. D). The plaintiff testified that Dr. Laursen did not pay for the property but that he simply took over the mortgage of $115,000.00. This was done without the consent of the mortgagors, the Rowes, but the Rowes cashed the checks and Dr. Laursen paid off the mortgage in the five years. Dr. Laursen resided in the Unit after the purchase. (Depo. I, pgs. 11–15 and Exs. 3 and 6–8 and Ex. D to Response to Motion). Dr. Laursen never recorded the September 1983 deed, which the plaintiff cannot explain (Depo.II, pg.74). Dr. Laursen paid all the property taxes, insurance and condominium fees on the Unit (Depo. I, pg. 24 and Ex. 9).

7. At the same time, Dr. Laursen also "purchased" the plaintiff's chiropractic practice, the business and equipment, apparently for $75,000.00, although the plaintiff stated in the 1997 deposition that the sale was for $375,000.00. (Depo. I, pgs. 11–15, Ex. 3 and Ex. D to Response to Motion). The plaintiff owned the building and Dr. Laursen paid rent to him, approximately $1,000.00 a year (Depo.II, pg.85).

8. The Court notes that the plaintiff's testimony differs between the 1988 and 1997 depositions as to the nature of this transaction. In fact, in 1988, the plaintiff testified that the "sale" was not really a sale, but that Dr. Laursen was going to take over the practice for several years. Therefore, Dr. Laursen gave him $75,000.00 to hold in escrow to cover possible damages to the practice. The Court again notes the inconsistencies in the plaintiff's statements, in the 1997 deposition he admits there was a sale, no escrow, and the money was his to have at any time. There was no contract between the men; it was done strictly on a trust basis (Depo. I, pgs. 11–15, 37–38, Ex. 3 and Ex. D to Response to Motion). The plaintiff asserts that he just was taking some time off, traveling, etc., for about five years. The plaintiff testified that his income was the $1,000.00 a month rent on the office (Depo.I, pgs.25–26).

9. The plaintiff also had bank accounts in the Bahamas, in particular the Canadian Imperial Bank of Commerce (Imperial Bank), which was opened in late 1983 (Dennis C. Burrill Deposition 1988 (Depo.II), pg. 10). (Depo. II, pgs. 13 and 37).

10. The plaintiff and Laursen did not want to have the plaintiff pay taxes on the money and then Dr. Laursen to have to pay taxes when he got it back in about three years. Based on the need to hide the transaction, the plaintiff deposited the $75,000.00 in the Imperial Bank by way of eight $9,000.00 cashier checks and one $3,000.00 cashier check, which he thought would go unreported since no check was for more than $10,000.00 (Depo.II, pgs.14–16). The plaintiff flew to the Bahamas and opened an account in the Imperial Bank in his name only, but other monies from Dr. Laursen also went into the account at other times, probably between $300,000.00 and $400,000.00. At times, the plaintiff actually took Dr. Laursen's money down and deposited it in the account (Depo.II, pgs.23–24). By the time of the 1988 deposition, this account was closed (Depo.II, pg.28).

11. Dr. Laursen also had at least one account in his name at the Imperial Bank, with the plaintiff's name on the account (Depo.II, pg.27). There was a third account which was in the plaintiff's name, where interest from the other accounts accumulated. The plaintiff testified that the money that was withdrawn from this account went to Dr. Laursen (Depo.II, pgs.33–34).

12. From about 1983 to 1986, all the money that came out of the Bahamian bank accounts was turned over to Dr. Laursen. At some point, they took the interest related to the $75,000.00 "escrow" money, in the amount of $15,000.00 for the plaintiff. The plaintiff filed amended tax returns for the years 1983–1986 and a portion of 1987 and divided the interest income between those years (Depo.II, pgs.44, 48–50).

13. At the end of the three years, Dr. Laursen was not ready to turn the practice back over to the plaintiff, he wanted another year or so, but he offered to reimburse the plaintiff. The plaintiff asked for the $75,000.00 plus the accumulated interest on the "escrow" account (in the amount of $15,000.00) and, in addition, they agreed payment of $200,000.00, representing their assessment of one-third of the value of the practice. The plaintiff agreed not to go into another practice for a year. The plaintiff therefore received approximately $290,000.00 (Depo.II, pgs.56–59). The plaintiff testified that he took the money out of the Bahama account in 1987 (Depo.II, pgs.65–66).

14. During 1987, Dr. Laursen "started becoming very concerned" and, as a consequence, the plaintiff also became concerned about the Bahamian account which was in his name. The plaintiff testified that he told Laursen "Hey, you know, gee whiz. You got to make sure you tell these people about this, that's (sic) it's not my money, it's your money, because sooner or later they're going to find out about it." Dr. Laursen was not willing to do what was requested, so the plaintiff told Laursen he wanted the practice back in about April 1988. Dr. Laursen prepared to move to another location and set up a practice, but decided to leave because he thought the Internal Revenue Service (IRS) was "right on his tail" (Depo.II, pgs.60–63)

15. The plaintiff claimed that there were papers he needed to have Dr. Laursen sign

before he left, but Laursen refused to sign them unless the plaintiff gave him all the money in the Imperial Bank account. The plaintiff refused the "deal" but later said okay if Dr. Laursen would turn over the condominium on the beach and a shared condominium in Colorado to the plaintiff, as restitution. The plaintiff bought out Laursen's accounts receivable for fifty cent on the dollar (Depo.II, pgs.63–65).

16. The plaintiff made Laursen sign a statement that the money in the Imperial Bank account was in fact Laursen's money. The statement, which the plaintiff helped draft, read:

> THIS LETTER IS INTENDED TO BE READ BY THE INTERNAL REVENUE SERVICE:
>
> All of the money in the Bahamas is mine with the exception of $75,000.00, which was to be held in escrow by Dr. Dennis Burrill, for the practice. Now this $75,000.00 is to be given to Dr. Dennis Burrill, along with my condo on the beach and with $200,000.00, which I paid to Dr. Burrill around the first of the year (1988) (handwritten change to 87), as compensation for the damage to the practice.

(Depo.I, Ex. 13).

The plaintiff admits that much of what is in this statement is false. There was no escrow, the money always belonged to the plaintiff, the Unit was not given to the plaintiff, but he claims he purchased it, and the $200,000.00 was the in the Imperial Bank and the plaintiff was trying to account for its existence. The $200,000.00 came from the sale of his boat and other monies he took to the Bahamas, he wanted to retrieve it without causing problems (Depo.I, pgs.39–42).

17. On July 12, 1985, a Warranty Deed was signed which purports to deed, from Villy P. Laursen, to Dennis C. Burrill, a single man, the condominium unit in question (Ex. 5 to Depo. I). The plaintiff testified that he does not remember anything about the Warranty Deed and it probably was never recorded (Depo.I, pgs.20–21).

18. On April 5, 1988, a check, drawn on the Imperial Bank from the plaintiff's account, was issued to Dr. Villy Laursen in the amount of $216,080.08. In his 1997 deposition, the plaintiff asserts that the check was for the purchase of the equipment in the office (approximately $46,000.00); for Dr. Laursen's half interest in the Colorado condominium (approximately $30,000.00) and for the purchase of the Unit (approximately $140,000.00). However, the plaintiff previously testified that he and Laursen agreed the property was worth $115,000.00 (Depo. I, pgs. 29–31 and 35 and Exs. 12 and 13 and Depo. II, pgs. 67–68). At the time of the alleged transactions, the plaintiff was aware that Dr. Laursen was preparing to flee the country (Depo.I, pg.53).

19. The plaintiff maintains that Dr. Laursen signed a quitclaim deed for the Colorado condominium but not for the beach Unit, because he told the plaintiff it was not necessary since he had never recorded the deed in Laursen's name (Depo.I, pg.43). At the time of the purported transfer, Dr. Laursen also drafted a letter, with the plaintiff's help, addressed to the Madeira Towers Board of Directors Condo Association, wherein he stated he "turned over the ownership of Unit 1003, to Dr. Dennis Burrill" (Depo.I, Ex. 14).

20. After the plaintiff resumed control over the Unit, which he was planning to rent, the IRS put a lien on the property and confiscated the rent while it was occupied. The unit is now vacant, but the plaintiff maintains he has been paying the property taxes and maintenance dues since 1988. The IRS has released the levy but not the liens on the Unit (Depo.I, pgs.45–48).

21. The plaintiff entered into a plea agreement in 1996, wherein he plead guilty to conspiracy to defraud the United States by impeding or impairing the Internal Revenue Service, in violation of 18 U.S.C. § 371. The plaintiff admitted the following facts to be true:

> Beginning in or about September 26, 1983, and continuing thereafter until on or about December 14, 1989, within the Middled District of Florida, Dennis C. Burrill participated in a scheme to defraud the United States by (1) disguising the sale of his chiropractic practice, (2) placing the proceeds of the sale and other taxable income in foreign bank accounts, (3) failing to dis-

close the existence of said accounts and the taxable interest earned from said accounts to the Internal Revenue Service and further by (4) making false statements to representatives of the Internal Revenue Service regarding these events in an attempt to impair and obstruct the Internal Revenue Service in its investigation of the defendant's tax liabilities.

(Depo.I, Ex. 16).

22. The plaintiff claims that the chiropractic business, which he purportedly repurchased in 1998, was not in good shape when he got it back, mostly it was just the equipment. However, he reported a business income of $98,697.00 in 1989 and $236,-147.00 in 1988. The plaintiff says everything just "took off" after he came back and, in addition, he collected the accounts receivable of about $100,000.00, for which he had paid $50,000.00 (Depo.I, pgs.54–57).

23. Dr. Laursen admitted to the plaintiff that he was doing some drug trafficking, but the plaintiff testified he was not involved in any way (Depo.I, pgs.59–60)

24. There are five Notices of Tax Lien filed in the public records for Pinellas County, Florida, which each constitute a cloud on the title to Unit 1003. The liens relate to the tax obligations of Villy P. Laursen. Some of the tax liens are against the plaintiff, as nominee of Villy P. Laursen (Ex. A to Amended Complaint). The IRS, on June 8, 1988, made jeopardy assessments against Laursen for 1984, 1985, and 1986, in the amount of $401,005.22, taxes, penalties and interest (Amended Complaint, Paragraph 6(b)-(d).

25. On or about, September 5, 1996, the plaintiff, by certified mail, requested the IRS issue a certificate of release of tax liens, but the IRS failed to issue the certificate. The plaintiff thereafter filed and Administrative Claim for Damages pursuant to the Internal Revenue Code (Title 26) (IRC) § 7432 for Failure to Release Notice of Federal Tax Lien, claiming that his contract for sale had fallen through and that he suffered losses of $205,000.00 from terminated sale, $3,000.00 per year ownership costs, and costs and fees of litigation and claim prosecution. The plaintiff admits to failing to take advantage

of IRC § 6325(b)(3), which facilitates the sale of property subject to federal tax liens by providing for the discharge of the property from the effect of the liens and the substitution of the proceeds of the sale as property subject to liens. (Response to Motion, pgs. 8–9 and Response to Request for Admission 8).

## STANDARD OF REVIEW

This circuit clearly holds that summary judgment should only be entered when the moving party has sustained its burden of showing the absence of a genuine issue as to any material fact when all the evidence is viewed in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir.1983). All doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Hayden v. First National Bank of Mt. Pleasant*, 595 F.2d 994, 996–7 (5th Cir.1979), quoting *Gross v. Southern Railroad Co.*, 414 F.2d 292 (5th Cir.1969). Factual disputes preclude summary judgment.

The Supreme Court of the United States held, in *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986):

In our view the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.*, 106 S.Ct. 2548, 91 L.Ed.2d at 273.

The Court also said, "Rule 56(e) therefore requires that nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing there is a genuine issue for trial.'" *Celotex Corp.*, 106 S.Ct. 2548, 91 L.Ed.2d at p. 274. As the district court in *Coghlan v. H.J. Heinz Co.*, 851 F.Supp. 808 (N.D.Tex.1994), summarized:

Although a court must "review the facts drawing all inferences most favorable to the party opposing the motion,"...the

nonmovant may not rest on mere allegations or denials in its pleadings; in short, "the adverse party's response... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). However, merely colorable evidence or evidence not significantly probative will not defeat a properly supported summary judgment...The existence of a mere scintilla of evidence will not suffice...(cites omitted) 851 F.Supp. at 810–811.

Issues of fact are "'genuine' only if a *reasonable* jury considering the evidence presented could find for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis added). The Court must "draw inferences from the evidence in the light most favorable to the non-movant and resolve all *reasonable* doubts in that party's favor." *Specialty Malls of Tampa, Inc. v. City of Tampa*, 916 F.Supp. 1222 (M.D.Fla. 1996). (emphasis added) A court is not required to allow a case to go to trial "when the inferences that are drawn from the evidence, and upon which the non-movant relies are 'implausible.'" *Mize v. Jefferson City Board of Education*, 93 F.3d 739, 743 (11th Cir. 1996).

## DISCUSSION

Based on the above recited fact scenario, the plaintiff comes before the Court seeking a determination that it is entitled to summary judgment and asks the Court to hold that the plaintiff is the owner of the Unit in question and to further find that the tax liens should be disregarded. The plaintiff would have the Court find the defendant liable for damages, attorney's fees and costs for intentionally denying the plaintiff's request for Certificate of Release of Lien. The defendant asks the Court to deny the motion for summary judgment based on the evidence now before it.

The plaintiff asserts that the Court is required to grant his motion for summary judgment because Dr. Laursen had no interest in the Unit to attach when the IRS assessed tax liability against him, because his motion concludes that he paid a full and fair market value for the Unit, paid in full, in cash, on April 5, 1988. The defendant conversely asserts that summary judgment is not appropriate because it alleges that the purported transfer in 1988 of the Unit to Dr. Burrill was a sham and the intent was to defraud the IRS and the United States.

The parties both agree that Florida law should be utilized to determine if the nature of the taxpayer's [here Laursen] rights in the property, but then you turn to federal law to see if those property rights, if any, are "property or rights to property" subject to federal tax liens within the meaning of IRC §§ 6321 through 6323. *United States v. National Bank of Commerce*, 472 U.S. 713, 727, 105 S.Ct. 2919, 86 L.Ed.2d 565 (1985); *Viva Ltd. v. United States*, 490 F.Supp. 1002 (D.C.Co.1980). The parties further agree that the plaintiff sold Unit 1003 to Dr. Laursen in September 1983 (Motion, pg. 11, Response to Motion, pg. 15). However, the plaintiff asserts that the plaintiff, by operation of the doctrine of "equitable conversion," held "the bare legal title in trust for Laursen" when it was originally "sold" in 1983. The plaintiff also asserts that he acquired equitable title to the Unit in April 1988. The defendant disagrees but asserts that even if the plaintiff is correct the motion for summary judgment should not be granted because of the remaining issue of fraud.

The Court agrees with the defendant on this issue. The underlying question is whether or not the purported transfer of the Unit to the plaintiff in 1988 was done with fraudulent intent. If the transfer was made "with actual intent to hinder, delay or defraud any creditor" of the transferor, the transfer is fraudulent and may be avoided. Ch. 726, Fla. Stat. The question of motive and intent will certainly require consideration of the credibility of the plaintiff and the reasonableness of the circumstances at issue. The Court cannot make any credibility findings on summary judgment. Therefore, the Court finds that there are material issues of fact which must be considered by the factfinder in this case. Accordingly, it is

**ORDERED** that the motion for summary judgment be **denied** (Docket No. 33)